**Alex WOLF as Trustee in Bankruptcy of Regent Case Co., Inc., Bankrupt, Plaintiff,**

v.

**AERO FACTORS CORPORATION, Defendant.**

United States District Court
S. D. New York.

June 28, 1954.

As Amended by Supplemental Opinion
July 13, 1954.

Monroe J. Cahn, New York City, for plaintiff.

Abraham Golub, New York City, for defendant.

LEIBELL, District Judge.

This is a suit by the Trustee in Bankruptcy of Regent Case Co., Inc. (A) to have a chattel mortgage, given by the bankrupt to the defendant, Aero Factors Corporation, adjudged invalid and void and to recover the value of the mortgaged property, which the defendant allegedly preferentially seized and sold within the four months' period preceding bankruptcy; and (B) to recover certain alleged preferential payments made by the defendant to itself within the four months' period preceding bankruptcy out of money due the bankrupt.

In June, 1949, the bankrupt, a New York corporation with offices at 2926 White Plains Road, Bronx, N. Y., was engaged in the manufacture and sale of ladies compacts. The defendant, a New York corporation with offices at 540 Myrtle Avenue, Brooklyn, N. Y., was engaged in the business of factoring. On or about June 9, 1949, the bankrupt executed and delivered to the defendant a chattel mortgage to secure a loan of $7,500, which was evidenced by a series of ten promissory notes each in the sum of $750. The mortgage recites that the mortgagor, Regent Case Co., Inc., had offices and a factory at 2926 White Plains Road, Borough of Bronx, and that the machinery, fixtures and chattels set forth in Schedule "A" annexed to the mortgage were "in the premises at 2926 White Plains Road, Bronx, New York, and in care of Otto Schreiber, 1947 Flushing Avenue, Brooklyn, New York." The particular chattels at each location were not specified. The chattel mortgage was filed in the City Register's office in the Borough and County of Bronx and in the Borough of Brooklyn, County of Kings. Street number 1947 Flushing Avenue, Brooklyn, was the actual and proper mailing address of Otto Schreiber, the person to whom

some of the chattels, certain dies, had been delivered to do certain work for the bankrupt, and these chattels were located at Schreiber's said place of business. However, although Schreiber's premises were serviced by the Brooklyn post office, they were in fact located in the Borough and County of Queens, New York. The chattel mortgage was never filed in the Register's office in the Borough and County of Queens.

The trustee asserts that the defendant's failure to file the chattel mortgage in the County of Queens completely invalidates the mortgage for lack of compliance with Sections 230 and 232 of the New York Lien Law, McK.Consol. Laws, c. 33.[1] The defendant contends that the mortgage is entirely valid; but that if its filing was defective as to

chattels in Queens County, the mortgage should be held valid as to the chattels situated at the bankrupt's place of business in Bronx County where the mortgage was properly filed.

■ I have concluded that the chattel mortgage is invalid as to the chattels situated in Queens County. The problem as to the Queens chattels is answered by In re National Browne Co., Inc., 2 Cir., 151 F.2d 595, 596. In that case all the mortgage chattels were located at No. 1852 Flushing Avenue, which was actually within the County of Queens, although it had a Brooklyn post office number. The appellate court affirmed a ruling that the chattel mortgage was invalid since it was not filed in compliance with Section 232 of the New York Lien Law.

1. "§ 230. Chattel mortgages to be filed

"Every mortgage or conveyance intended to operate as a mortgage of goods and chattels * * * which is not accompanied by an immediate delivery, and followed by an actual and continued change of possession of the things mortgaged, is absolutely void as against the creditors of the mortgagor, and as against subsequent purchasers and mortgagees in good faith and for a fair consideration, unless the mortgage, or a true copy thereof, is filed as directed in this article. * * * As amended L.1911, c. 326; L.1916, c. 348; L.1921, c. 419; L.1937, c. 810, eff. June 1, 1937."

"§ 232. Where filed

"An instrument, or a true copy thereof, if intended to operate as a mortgage of a canal boat, steam tug, scow or other craft, or of the appurtenances thereto, navigating the canals of this state, must be filed in the office of the superintendent of public works, and need not be filed elsewhere. Every other chattel mortgage, or an instrument intended to operate at such, or a true copy thereof, must be filed in the county within the city of New York or in the town or city where the mortgagor, if a resident of the state, resides at the time of the execution thereof, and if not a resident, in the county within the city of New York or in the town or city where the property mortgaged is at the time of the execution of the mortgage. If there is more than one mortgagor, the mortgage, or a true copy thereof, must be filed in each county within the city of New York or town or city within the state where each mortgagor resides at the time of the execution thereof, and if any such mortgagor be a nonresident of the state at such time, then also in the county within the city of New York or in the town or city in which the property mortgaged is at such time. In the city of New York, such instrument must be filed as follows: In the borough of Brooklyn, such instrument shall be filed in the office of the city register in the county of Kings; in the borough of Queens, in the office of the city register in Queens county; in the borough of Richmond, in the office of the clerk of the county of Richmond; in the borough of Manhattan, in the office of the city register in the county of New York, and in the borough of the Bronx, in the office of the city register in the county of Bronx. In every other town or city of the state, such instrument shall be filed in the office of the town or city clerk, unless there is a county clerk's office in such town or city, in which case it must be filed therein. If the chattels mortgaged are in the city of New York at the time of the execution of the mortgage, the mortgage or a true copy thereof must be filed in the county within the city of New York or in the town or city where the mortgagor or each of several mortgagors who are residents of the state alleges to reside at the time of the execution of the mortgage, and also in the county where the property is situated. * * * As amended L.1944, c. 169, eff. Sept. 1, 1944."

Although "strict compliance with the statute is required to create the lien", In re National Browne Co., Inc., supra, nevertheless a court of bankruptcy is a court of equity and the lien should be recognized as valid in relation to the mortgaged chattels located in Bronx County, where the mortgage was properly filed. The proof has established which chattels were situated in the Bronx. The purpose of the filing statute is to enable the public to know whether particular personal property is encumbered or not. The principal office of Regent Case Co., Inc. was in the Bronx. Filing the chattel mortgage in the Bronx was all the notice the statute required as to the chattels in the Bronx. It would be unreasonable to hold that the fact that some of the chattels listed in the mortgage schedule were in the Borough and County of Queens should destroy the entire security and render the chattel mortgage void as against the other chattels located in the Bronx, in respect to which the filing sections of the Lien Law were fully satisfied. Hubbardston Lumber Co. v. Covert, 35 Mich. 25; In re Soldier's Business Messenger & Dispatch Co., D.C.N.Y., 22 Fed.Cas.No.13,163, p. 781.

The trustee contends that the chattel mortgage is totally invalid and void on a further ground. When the defendant loaned the bankrupt the $7,500 it deducted $150 by way of prepaid interest upon the loan. It is the trustee's position that this "interest in advance" was in violation of the New York General Corporation Law, Section 18, McK.Consol.Laws, c. 23,[2] and the New York Banking Law, § 131 sub. 1, McK. Consol.Laws, c. 2,[3] and that these viola-

---

2. "§ 18. Prohibition of banking powers
"No corporation, domestic or foreign, other than a corporation formed under or subject to the banking laws of this state or of the United States, and except as therein provided shall by any implication or construction be deemed to possess the power of carrying on the. business of discounting bills, notes or other evidences of debt, of receiving deposits, of buying and selling bills of exchange, or of issuing bills, notes or other evidences of debt for circulation as money, or of engaging in any other form of banking; * * * provided further that engaging in the business of loaning money in this state on bonds, notes or other evidences of indebtedness, secured by deeds of trust or mortgages upon real property or personal property situated in, upon or appurtenant thereto, and/or purchasing of or otherwise acquiring existing bonds, notes or other evidences of indebtedness, deeds of trust or mortgages of or upon such properties, or any interest therein, and the holding of the same, or the endorsing, selling, assigning, transferring or disposing of the same to another corporation, by a domestic business corporation, or by a foreign corporation which has obtained from the secretary of state a certificate authorizing it to transact business in this state, shall not be deemed or construed to violate any of the provisions of the banking law. As amended L.1932, c. 238; L.1935, c. 905; L.1941, c. 29, § 2, eff. Feb. 26, 1941."

3. "§ 131. Prohibitions against encroachments upon certain powers of banks and trust companies
"1. No person unauthorized by law shall subscribe to or become a member of, or be in any way interested in any association, institution or company formed or to be formed for the purpose of issuing notes or other evidences of debt to be loaned or put in circulation as money; nor shall any such person subscribe to or become in any way interested in any bank or trust company or fund created or to be created for the like purposes or either of them. No corporation, domestic or foreign, other than a national bank or a federal reserve bank, unless expressly authorized by the laws of this state, shall employ any part of its property, or be in any way interested in any fund which shall be employed for the purpose of receiving deposits, making discounts, receiving for transmission or transmitting money in any manner whatsoever, or issuing notes or other evidences of debt to be loaned or put into circulation as money. All notes and other securities for the payment of any money or the delivery of any property, made or given to any such association, institution or company, or made or given to secure the payment of any money loaned or discounted by any corporation or its officers, contrary to the provisions of this section shall be void."

tions voided and made invalid the chattel mortgage. But the New York Court of Appeals has expressly held that a business corporation may lend money on real and personal security without in any form conducting a banking business. Meserole Securities Co. v. Cosman, 253 N.Y. 130 at page 134, 170 N.E. 519. A factoring business is not a form of banking business. Pennsylvania Factors Corporation v. S. Oldman Inc., 272 App. Div. 1049, 74 N.Y.S.2d 670.

■■■ The statute sanctions the mortgage loan transaction involved in this case, but it is silent on the question of interest paid in advance. Bankers are expressly authorized by statute to deduct interest in advance, New York Banking Law, § 108, subd. 1, but such authorization does not preclude all but bankers from taking interest in advance. Hungerford Brass & Copper Co. v. Brigham, 47 Misc. 240, 243, 95 N.Y.S. 867. Although a small additional advantage is thus acquired by the lender, it has been held that, in view of long established commercial custom, individuals and corporations, as well as banks, may lawfully deduct interest in advance on short term negotiable instruments. New York Firemen Insurance Company v. Ely, 2 Cow., N.Y., 678 at page 704. The deduction of interest in advance did not invalidate either the loan Aero made to Regent or the security of the chattel mortgage that Regent gave Aero.

As stated above, the schedule of chattels annexed to the mortgage does not show which of the chattels were located at the Flushing Avenue premises of Otto Schreiber and which were at the bankrupt's premises at White Plains Road in the Bronx. However, Abraham Golub, Esq., who drew up the chattel mortgage, and who then was, and now is, the attorney for the defendant, testified that after the mortgage was originally executed on June 1, 1949, he went to the White Plains Road premises of the mortgagor and compared the equipment there located with the list of equipment in the chattel mortgage schedule; that all the equipment was located at the Bronx premises, except fifty items; that those fifty items Mr. Golub found at 1947 Flushing Avenue, the premises of Otto Schreiber; that they were special dies which Schreiber used in stamping some of the compacts for the bankrupt.

After his inspections of the chattels subject to the mortgage, Mr. Golub made a change in the mortgage to declare that some of the chattels were located at Schreiber's premises. The mortgage was then, on June 9, 1949, re-executed by the parties and "within one or two days" thereafter was filed in Bronx County and in Kings County.

Counsel have stipulated that the value of the chattels located at the Flushing Avenue premises of Otto Schreiber represented one-third of the total value of all of the chattels described and listed in the chattel mortgage and that the value of the chattels located at White Plains Road in the Bronx represented two-thirds.

Apparently the mortgagee discovered the error of failing to file the chattel mortgage in Queens County, and on April 10, 1950 instituted an action against the mortgagor in the Supreme Court, County of Kings, for the sum of $5,531.49 as the balance due and unpaid on the notes representing the loan secured by the chattel mortgage. On May 5, 1950, judgment was entered by default in that action in the sum of $5,659.74. On May 8, 1950 execution on said judgment was issued to the Sheriff of the City of New York, Queens County Division, and acting thereunder the sheriff levied upon the chattels (dies) located in No. 1947 Flushing Avenue, Borough of Queens, City of New York, which were a part of the chattels listed in the schedule annexed to the chattel mortgage. Those dies were the same chattels which Mr. Golub found at No. 1947 Flushing Avenue at the time of his inspection in June 1949. On May 15, 1950, under the said default judgment, the sheriff sold the said chattels for the sum of $100 to Mr. Golub, who acted for defendant in making the purchase.

878

The parties have stipulated that at all times after March 1, 1950, the bankrupt was insolvent within the meaning of the Bankruptcy Act and that the defendant had reasonable cause to believe that the bankrupt was insolvent after March 1, 1950. Under those circumstances the sheriff's sale conducted under an execution issued on a default judgment was a preferential transfer of bankrupt's property, voidable by the trustee in bankruptcy in a suit such as this. Grant v. National Bank of Auburn, D.C.N.Y., 232 F. 201 at page 212; Adler v. Greenfield, 2 Cir., 83 F.2d 955.

About April 20, 1950, the chattel mortgagee, Aero Factors Corporation, took possession of the chattels then located at the premises of Regent Case Co., Inc., at 2926 White Plains Road, Borough of Bronx, claiming to act under the chattel mortgage. On April 26, 1950, at 9:00 A.M., through one Jack Kasper, an auctioneer, the defendant purported to sell these chattels for the sum of $500, under a foreclosure of the mortgage. The purchaser was Arthur Baer, president of defendant, acting for defendant. The only public notice of this sale was published in the Journal of Commerce on April 26, 1950, the day of the sale. Since the chattels were sold at 9:00 A.M. on that date, for all practical purposes the sale had taken place before anyone could have read and acted on the notice. The inadequacy of such an advertisement has been noted and the procedure condemned. Morrisania Laundry Service v. Strauss, 137 Misc. 488, 242 N.Y.S. 579. The chattels were sold to the defendant for $500 and there is no proof that anyone attended the sale except the defendant. In effect it was no sale, or at best a private sale by Aero to itself.

In making a sale under the chattel mortgage the mortgagee was required to act in good faith, obtaining as far as possible the fair market value of the property. Fleischmann v. Clausen, 222 App.Div. 7, 225 N.Y.S. 288. A mortgagee of chattels after default is at law the owner. If he sells, and the sale is valid, he cuts off the mortgagor's equity of redemption. If he resumes possession, but fails to sell within a reasonable time, or sells unfairly or irregularly, the mortgagor will be credited with payment of the debt up to the actual value of the security thus sold. Harrison v. Hall, 239 N.Y. 51, 145 N.E. 737. The sale of the chattels by the mortgagee, Aero Factors Corporation, to itself was unfair and irregular and the mortgagor must be credited with payment of its debt up to the true value of the property sold. Casserly v. Witherbee, 119 N.Y. 522, 23 N.E. 1000. That presents the question—What was the value?

On or about July 21, 1950, four days after a petition in involuntary bankruptcy was filed against the Regent Case Co., Inc. in this court, the defendant sold all of the chattels originally listed in the chattel mortgage, which it had purchased at the execution sale conducted by the sheriff on May 15, 1950, and at the sale under the mortgage on April 26, 1950, to Benedict B. Zimet for the sum of $8,500. The defendant paid a broker $425 as a commission of 5% on the sale price to Zimet. In addition the defendant had paid the sheriff's storage charges of $25 and his cartage charges of $25 on the Queens chattels.

Further, the defendant paid the rent of the bankrupt's premises, No. 2926 White Plains Road in the sum of $1,165, in order to keep the chattels at said address and sell them to Zimet, who then moved into those premises. Thus the defendant, Aero Factors Corporation, paid in all $1,640 in securing possession of these chattels, maintaining them in the premises and in selling them to Zimet. Defendant netted $6,860 on the sale. The trustee contends that this figure represents the value of the chattels and that his claim of illegal preference based on the acquisition and sale of these chattels by the defendant should be calculated on such value. The defendant asserts that the sum of the prices it paid at the Bronx auction and at the sheriff's sale in Queens County, a total

of $600, represents the value of the chattels.

The $100 which was obtained from the sale of the chattels at the premises No. 1947 Flushing Avenue to the defendant by the sheriff is not an indication of the value of the chattels sold. None of the bidders present at the sheriff's sale bid on these chattels and the attorney for the defendant bought them in for $100. Since these chattels were dies used in the business of Regent Case Co., Inc., their value might have been nominal when sold alone. When later sold together with the other chattels located at White Plains Road in the Bronx, the sale conditions presented a fairer picture of the true value of all the chattels.

The Queens sheriff's sale was a forced sale and under conditions which give no true indication of the value of the chattels sold. Adler v. Greenfield, supra. Nor was the $500, for which the defendant bid in the Bronx chattels at the so-called public sale under the chattel mortgage, the true value of the Bronx chattels. Strong v. Dahm, Sup., 39 N.Y.S.2d 266. A better measure of the fair market value of the property involved would be the $8,500 sale price, on the sale of the chattels by the defendant to Benedict B. Zimet on July 21, 1950.

Further, only about a year before, on June 1, 1949, Aero Factors loaned Regent Case $7,500, taking the chattels at the Queens and Bronx locations as security for Regent's ten promissory notes, each for $750. If the chattels were worth only $600, would Aero have loaned more than twelve times that amount against the chattels as security? Aero must have thought at the time that the chattels were good security for the loan. The figure of $7,500 is pretty close to the price of $8,500 for which Aero sold the chattels to Zimet.

I find, therefore, that the net value of the chattels covered by the chattel mortgage was $6,860. On the chattels which were located at 2926 White Plains Road the lien of the chattel mortgage was good, but as to the chattels which were located at 1947 Flushing Avenue the mortgage was not a valid lien. Since it has been stipulated that the Queens chattels represent one-third of the value of all the chattels, the trustee would be entitled at least to a judgment of $2,286.67 (one-third of $6,860) on his first and second causes of action herein.

But the trustee contends that, if the chattel mortgage is found to be valid as to the chattels located in the County of Bronx, he should prevail for an additional sum ($2,883.34) on the theory that the bankrupt had paid off $5,810 of the $7,500 loan, which the chattel mortgage secured, and that the chattel mortgage therefore was only security for the balance of $1,690 plus interest accrued. [Two-thirds of $6,860 is $4,-573.34. That figure, minus $1,690, leaves $2,883.34.]

The series of ten promissory notes, secured by the chattel mortgage, were all dated June 1st 1949. The first of these notes became due on September 1, 1949; the other notes, on the first day of each month thereafter; the tenth and final note, on June 1, 1950. Each note was for $750 and carried interest "at the rate of 2% monthly". But the chattel mortgage loan of $7,500 was not the only money loaned by Aero to Regent.

On September 9, 1949, the defendant loaned the bankrupt $1,775.70 and received in return a demand note without security of any kind. On the following dates the defendant loaned the bankrupt the sums listed below and received in return the unsecured demand notes of the bankrupt:

| On November 14, 1949 | $ 2,017.71 |
| " December 28, 1949 | 750.00 |
| " January 10, 1950 | 1,451.19 |
| " February 7, 1950 | 500.00 |
| " February 7, 1950 | 1,000.00 |
| " February 17, 1950 | 1,000.00 |
| " March 27, 1950 | 600.00 |
| " March 28, 1950 | 772.31 |
| " April 3, 1950 | 1,391.60 |
| " April 7, 1950 | 1,000.00 |

A third method by which Aero financed Regent was by loans against assigned accounts receivable. This was pursuant to a factoring agreement. In October, 1949, the defendant commenced withholding sums of money due the bankrupt on the assignment of accounts receivable and applying these sums to the discharge of the notes secured by the chattel mortgage. This practice continued until March, 1950. On and after March 1, 1950, the bankrupt was insolvent within the meaning of the Bankruptcy Act as the defendant had reasonable cause to believe. (Par. 19 of Stipulation of Facts.)

Apparently the defendant, in March, 1950, when its accountants were reviewing the entries made in its books of account by its bookkeeper, realized the folly of applying part of the money loaned on accounts receivable towards the discharge of the secured chattel mortgage notes, while leaving the unsecured notes unpaid and outstanding. Aero thereupon proceeded to apply to the unsecured notes the monies which it had previously credited to the notes secured by the chattel mortgage. The validity of this procedure by the defendant is questioned by the trustee, who takes the position that the monies, once having been applied towards the payment of the chattel mortgage notes on the books of Aero Factors, could not be reallocated and applied against the bankrupt's unsecured notes.

The court decisions in relation to the application by the creditor of payments made by a debtor, who owes his creditor money on several obligations, are many and quite comprehensive. Such a debtor, on paying money to his creditor, may direct that the payment be applied to a particular debt, because the money is his and he may control its application. But the debtor must exercise his option as to the application, when he makes the payment. After that the money ceases to be his and is no longer subject to his control. Then it belongs to the creditor and he may control its application. "As be-tween him and his debtor, certainly unless the debtor intervenes and requests (the creditor) to exercise his option, there can be no limit of time within which he must make the application. But if neither party makes any application of the payment and the matter comes into court, then the court will make such application of the payment as equity and justice require". Bank of California v. Webb, 94 N.Y. 467, at page 472.

In the case at bar there is no evidence that the debtor, Regent, gave any direction as to the application of the moneys credited to the payment of its obligations to Aero. The option as to the application of the payments rested then with Aero, the creditor; and Aero, on its own books, applied the payments to the notes secured by the chattel mortgage. It is this application that the trustee asserts may not be changed. But the creditor's book entries, if not communicated to the debtor, are not an irrevocable application of the payments. In the Matter of Stacy, Wolf Hat Co., Inc., 2 Cir., 99 F.2d 793.

There was no evidence in the case at bar that the creditor's application of the payments was ever communicated to the debtor. True, the voucher part of some of the checks by which Aero paid Regent the monies loaned on certain scheduled accounts receivable, contained notations as to deductions made by the defendant from the amount to be loaned. Samples of such notations are: "on a/c note 200." (Pl. Ex. 20–G); "200.00 ded. to be used against note pay." (Pl. Ex. 20–H); "less—notes Rec. 300—" (Pl. Ex. 23–A), and others. The earliest of these notations appears on checks drawn in October 1949. At that time there were two of the mortgage notes, each in the sum of $750, past due, and also an unsecured demand promissory note of September 9, 1949, for $1,775.70. The import of these notations on the checks was at best equivocal. Defendant could have been applying the deductions to either the secured notes or the unsecured notes. No specific note was in-

dicated by the notations and the separate amounts applied bore no relationship to the amount of any particular note then due.

The question arises as to just how long can a creditor delay in making a final, irrevocable application of a payment. The leading New York case on the question is Bank of California v. Webb, 94 N.Y. 467, where a creditor, after it had commenced an action against a guarantor, received a payment from the debtor with no direction as to how it should be applied. Over a year later the creditor applied the payment to a debt other than the one upon which it was suing the guarantor. The court held that in the absence of an application by the debtor, the creditor could make the application at any time before it was made under the direction of a court. See also Wanamaker v. Powers, 102 App.Div. 485, 93 N.Y.S. 19. In the instant case there was no application by the debtor, Regent, no request by Regent to the creditor, Aero, asking for a specific application of the credit, and no communication from Aero to Regent that an application of the payment had been made to any specific debt. The creditor, Aero, could properly re-apply the payments to Regent's unsecured notes, and cancel or write off on its books the application theretofore made to the mortgage note indebtedness concerning which Regent had not been informed. Allen v. Culver, 3 Denio, N.Y., 284. In the Matter of Stacy, Wolf Hat Co., Inc., 2 Cir., 99 F.2d 793.

According to the defendant's calculations, on the re-application of the monies to the unsecured notes, there was $5,494.32 due and owing on the mortgage notes as of March 1, 1950. In computing the amount due on the chattel mortgage notes the defendant made two mistakes. First, the defendant compounded the interest due on the notes, by adding the accrued interest to the principal due and then charging interest on that sum. The practice of compounding interest in this manner, or of allowing interest on interest, is not permitted under the law of New York, unless there is a new promise by the debtor after the interest has accrued. Young v. Hill, 67 N.Y. 162; Williamsburgh Savings Bank v. Town of Solon, 136 N.Y. 465, 32 N.E. 1058. See, also, In re Wisconsin Central Ry. Co., D.C. Minn., 63 F.Supp. 151. Second, the defendant continued to charge 2% monthly interest on the promissory notes, after they became due. Under New York law, a matured contract which contains no provision for interest after the debt is past due, draws interest on its principal from the date of maturity, not by virtue of the contract, but as damages for the breach thereof. O'Brien v. Young, 95 N.Y. 428. Interest after the breach would be at the rate of 6% per annum. New York General Business Law, § 370, McK.Consol.Laws, c. 20. Associated Metals & Minerals Corp. v. Swedish America Mexico Line, D.C., 48 F.Supp. 819, affirmed, 2 Cir., 140 F.2d 863.

There is insufficient evidence in the record for me to recompute precisely the balance due on the mortgage notes, using the proper method of computing the interest thereon. But according to the testimony of defendant's accountant, there was due on March 1, 1950, the sum of $5,494.32, after the credits had been re-applied from the unsecured notes to the mortgage notes. On April 10, 1950, when the defendant commenced its action in the Supreme Court of the State of New York, County of Kings, against the bankrupt, the amount claimed was $5,531.49 as the amount due on the mortgage notes at that time. The security was sold on April 26, 1950, so the sum due on that day would have been $5,531.49 plus sixteen days interest at 6% per annum or $5,546.24. The difference between the price realized on the sale of the Bronx chattels ($4,573.33) and the amount due on the notes according to defendant's improper calculations ($5,546.24) would be $972.91. I do not believe that a recomputation of the mortgage notes, using the proper methods of calculating interest, would result in so substantial a difference for so

short a period of time, and in the absence of proof to the contrary, I conclude that on April 26, 1950, the recalculated mortgage debt was in excess of the amount realized on the sale of the chattels. In such a case the plaintiff would be entitled to no recovery as regards the Bronx chattels. Therefore, the total amount due the trustee on the *first and second causes of action*, relating to the chattel mortgage, is $2,286.67, plus interest at 6% from January 28, 1952, the date this suit was commenced.

The trustee's *third cause of action* is based on certain alleged preferential payments of money by the bankrupt, Regent, to the defendant, Aero, made within the four months period preceding the bankruptcy. These alleged preferential payments were of two types and were related to the factoring agreement and the accounts receivable that were assigned thereunder.

Within the four months period preceding bankruptcy Regent assigned to the defendant certain accounts receivable listed on eleven schedules prepared and delivered at different times. (Pl.Ex. 5–15.) The assignments were made pursuant to the factoring agreement, dated June 1, 1949, whereby defendant agreed to "purchase" from time to time accounts receivable which were thereafter listed and duly assigned. Eighty percent of the face amount of the accounts thus assigned was to be paid to the bankrupt at the time of the said assignments, and the balance, less the defendant's charges, was to be paid when the scheduled assigned accounts were collected. The bankrupt was to turn over to defendant any moneys it received in payment of the assigned accounts. While the factoring agreement is in the form of a contract to purchase accounts to be assigned, the arrangement was in reality one for loans to be made on the security of assigned accounts. In re L. Gandolfi & Co. Inc., 2 Cir., 113 F.2d 300.

The trustee asserts that $2,259.70, which the defendant retained out of amounts payable to the bankrupt on the assignments of the eleven schedules of accounts receivable (Pl.Ex. 5–15) made during the four months period prior to the filing of the petition in bankruptcy, is recoverable by the trustee as preferential transfers. It was the defendant's practice to withhold a part of the 80% payable to the bankrupt when the bankrupt assigned a schedule of accounts receivable to the defendant, and to apply this money thus withheld to other past due obligations of the bankrupt. For example, on the assignment of the accounts receivable shown on Plaintiff's Exhibit 6, the defendant was to advance $1,557.84 to the bankrupt, 80% of the total of the accounts assigned. However, the defendant retained $450 of this sum as an offset against a deficit on a previous assignment, which arose from a return of merchandise by one of the bankrupt's customers whose account had been assigned. Similar action was taken by defendant in the assignments of the accounts receivable shown on Plaintiff's Exhibits 5, 7, 8, 9, 11, 13 and 14. The defendant also withheld from these accounts sums which were applied to other antecedent debts which the bankrupt owed. Were the sums withheld by Aero a "transfer" of bankrupt's property under the provisions of the Bankruptcy Act?

A "transfer", as defined in 11 U.S.C.A. § 1, sub. 30, includes:

"the sale and every other and different mode, direct or indirect, of disposing of or of parting with property or with an interest therein or with the possession thereof or of fixing a lien upon property or upon an interest therein, absolutely or conditionally, voluntarily or involuntarily, by or without judicial proceedings, as a conveyance, sale, assignment, payment, pledge, mortgage, lien, encumbrance, gift, security, or otherwise; the retention of a security title to property delivered to a debtor shall be deemed a transfer suffered by such debtor".

The word "transfer" in the statute is used in its most comprehensive sense, and is intended to include every means and manner by which property can pass from the ownership or possession of a

debtor to a creditor and by which the "preference" forbidden by the statute may be accomplished. Pirie v. Chicago Title & Trust Co., 182 U.S. 438, 21 S.Ct. 906, 45 L.Ed. 1171. A "transfer" can be made by a bankrupt although he may have been altogether passive, as where his property is taken from him on an execution sale. Adler v. Greenfield, 2 Cir., 83 F.2d 955. In the case at bar the bankrupt must have acquiesed in the deductions from the amounts due him and in the application of those sums to antecedent debts. Such conduct constituted a preferential transfer and the trustee is entitled to recover the $2,259.70 thus transferred. In re Ace Fruit & Produce Co., Inc., D.C.N.Y., 49 F.Supp. 986.

■■■ The assignments of the accounts receivable were for money loaned, a present consideration, and were not preferential under Section 60 of the Bankruptcy Act, 11 U.S.C.A. § 96. Doggett v. Chelsea Trust Co., 1 Cir., 73 F. 2d 614. The assignments of the accounts receivable were not fraudulent conveyances under Section 67, sub. d of the Bankruptcy Act, 11 U.S.C.A. § 107, sub. d(2) (a), even though they were made at a time when the bankrupt was insolvent, because the defendant paid a fair, present consideration for the assigned accounts. In re Ace Fruit & Produce Co., supra. Later occurrences cannot change a valid transfer of property into an illegal preference. Associated Seed Growers v. Geib, 4 Cir., 125 F.2d 683.

The trustee, however, claims a sum of $1,844.22 on the assigned accounts. The fund of $1,844.22 represents sums which the defendant collected over and above the amounts due to it on the loans it made against certain of the assigned accounts receivable. (Exs. 5, 6, 7, 8, 9, 12 and 14.) The defendant asserts that it is entitled to set off the said sum of $1,844.22 against the $3,024 which it loaned the bankrupt on other accounts receivable (Exs. 10, 11 and 13), on which defendant collected nothing at all, and against the deficit of $1,506 on the account receivable set forth on Exhibit 15.

■■■ The right of "set off" is governed by Section 68 of the Bankruptcy Act, 11 U.S.C.A. § 108. A basic requirement under that section is that the set off be of "mutual credits" against "mutual debts". In order to allow the set off claimed by the defendant herein there must be a basis of mutuality between the $1,844.22, which defendant holds in excess of the amounts loaned by it to the bankrupt on the accounts receivable represented by plaintiff's exhibits 5, 6, 7, 8, 9, 12 and 14, and the $4,530 ($3,024 plus $1,506) which the bankrupt owes the defendant for the monies loaned and uncollected on the accounts receivable represented by plaintiff's exhibits 10, 11, 13 and 15.

■■■ A controlling consideration in determining the status of mutuality is the capacity in which the defendant held the $1,844.22. If as to that sum the defendant were a trustee there could be no set off, since the bankrupt was a debtor as to the $4,530. Libby v. Hopkins, 104 U.S. 303, 26 L.Ed. 769. But if the defendant was only the bankrupt's debtor as to the $1,844.22 that sum may be set off against the $4,530 which the bankrupt owed the defendant on loans made by it on the uncollectible assigned accounts.

■■■ The fact that one person has collected for, and has in his possession, money belonging to another does not, without more, establish the relationship of trustee and cestui que trust. In re W. & A. Bacon Co., D.C.Mass., 261 F. 109. In the Bacon case a delivery company was allowed to set off the C.O.D. collections it made for the bankrupt, on packages delivered, against its delivery charges therefor, the court holding that the delivery company was not a trustee of the amounts collected.

The defendant has another argument in its favor on this issue of the right of "set off". The factoring agreement between the parties, under which the subsequent assignments of the accounts receivable were made, provided that the defendant did not have to pay the bank-

rupt the balance of monies collected above the 80% loaned on the accounts receivable if the bankrupt was otherwise indebted to the defendant; in which event the defendant was entitled to "retain and apply such remainder upon any indebtedness then or thereafter due from (the assignor)". (Paragraph 2 of Plaintiff's Exhibit 4.)

This agreement in paragraph 9, further provided that if the accounts receivable were not paid in full at maturity, the defendant could charge the amount due against or deduct it from "any payment then or thereafter due" from the bankrupt to the defendant.

 Paragraph 12 of the agreement contained a provision to the effect that the defendant could retain any monies, accounts or property of the bankrupt which came into defendant's possession and apply them to any obligation which the bankrupt owed the defendant. Agreements such as this have been upheld by the courts of New York. Grossi v. Rialto Security Corporation, 273 N.Y. 403, 7 N.E.2d 836.

The defendant's right to a "set off" of the $1,844.22 is sustained and the trustee's claim to said sum is rejected.

 The plaintiff, trustee in bankruptcy, is entitled to judgment for $2,286.67 under his first and second causes of action; and for $2,259.70 under his third cause of action; or a total judgment of $4,546.37, together with 6% interest thereon from January 28, 1952, the date of the commencement of this action. Kaufman v. Tredway, 195 U.S. 271, 25 S.Ct. 33, 49 L.Ed. 190; White Co. v. Wells, 6 Cir., 42 F.2d 460. The Court's Findings of Fact and Conclusions of Law are contained in the above opinion. Rule 52(a) Federal Rules of Civil Procedure, 28 U.S.C.A. Let a judgment be entered accordingly.

### Supplemental Opinion

After the Court's opinion was filed herein on June 28, 1954, the attorney for the plaintiff submitted a proposed order to show cause to reopen the case and increase the amount of his judgment on the first and second causes of action. The basis for the application was the entry of an item of $1,760.37 under date of June 30, 1950 (actually April 30, 1950), on Exhibit 37, a ledger sheet of defendant, which showed a credit of that amount against the Regent Case Co. mortgage receivable. I have conferred with counsel several times and they have now informed me that said item represents sums collected on accounts receivable which were not the subject of testimony at the trial and were not discussed in briefs of counsel. They have also recomputed, in accordance with my opinion, the interest on the mortgage debt up to May 1950. On that recomputation the figure of $5,546.24, mentioned in my opinion, becomes $5,216.07. From that figure ($5,216.07) the $1,760.37 above mentioned should be deducted, in ascertaining the amount due on the the chattel mortgage as of May 1, 1950, which leaves a figure of $3,455.70 as the balance due on the net amount of the mortgage debt as of said date. The attorneys have stipulated to the above corrections in the calculations. The difference between the $4,573.33, the net amount realized on the Bronx chattels from their sale to Zimet, and the above mentioned sum of $3,455.70, is $1,117.63. The amount of the judgment to which plaintiff is entitled on the first and second causes of action, under the last paragraph of the Court's opinion, should accordingly be increased by $1,117.63.

The first sentence of the last paragraph of this Court's opinion of June 28, 1954, is amended to read as follows:

"The plaintiff, trustee in bankruptcy, is entitled to judgment for $3,404.30 under his first and second causes of action; and for $2,259.70 under his third cause of action; or a total judgment of $5,664, together with 6% interest thereon from January 28, 1952, the date of the commencement of this action."