Milton R. ACKMAN, as Trustee of American Foam Rubber Corporation, Bankrupt, Plaintiff,

v.

WALTER E. HELLER & COMPANY, Inc., Defendant.

No. 63 Civ. 300.

United States District Court
S. D. New York.

June 28, 1968.

Kleeberg & Greenwald, New York City, for plaintiff; Jacob Greenwald, New York City, of counsel.

Seligson & Morris, New York City, for defendant; Charles Seligson, Robert Popper, Jerome M. Greenberg, New York City, of counsel.

WYATT, District Judge.

This is an action by the Trustee in Bankruptcy of American Foam Rubber Corporation ("Foam"), a New York corporation, on account of a preference alleged to have been received by defendant Walter E. Heller & Company, Inc. ("Heller"), a Delaware corporation. The Trustee relies on Section 60a(1) and b of the Bankruptcy Act (Act of July 1, 1898, 30 Stat. 544, c. 541, as amended; the "Act" ; 11 U.S.C. § 96(a)(1)) and on Section 15 of the New York Stock Corporation Law (in effect during the relevant period but since repealed) applicable under Section 70e(1) of the Act (11 U.S.C. § 110(e)(1)). There is jurisdiction in this Court under the cited sections of the Bankruptcy Act.

No jury having been demanded, the action was tried to the Court.

Foam made and (through subsidiaries) sold foam rubber and foam rubber products, such as pillows, mattresses, and furniture cushioning. The foam rubber was made from latex bought from suppliers.

Foam had the following subsidiaries:

1. Burlington Holding Corp. ("Burlington"), which owned land and a plant in Burlington, New Jersey, and leased this land and plant to Foam (Burlington

is on the Delaware River a few miles northeast of Philadelphia) ;

2. Burlington Workshops, Inc. ("Workshops"), which had a workshop, a "service organization";

3. Mirafoam Industrial Sales, Inc. ("Industrial"), which sold foam rubber products to industrial users, principally manufacturers;

4. Mirafoam Industrial Sales of Illinois, Inc. ("Illinois") which likewise sold to industrial users;

5. Mirafoam, Inc. ("Mirafoam"), which sold foam rubber products to the retail trade, including big department stores; and

6. Riverside Industries, Inc. ("Riverside"), which made cloth covers for the foam rubber products sold at retail; its plant was located in Riverside, New Jersey, about five to ten miles from the Burlington plant, and also on the Delaware River.

All these subsidiaries were New York corporations except Illinois and Riverside which were Delaware corporations.

Foam and its subsidiaries had their principal offices in the Empire State Building in New York City. They operated as an integrated business and, except where significant, no distinction is made herein between Foam and its subsidiaries.

Heller is in the business of lending money and supplying related financial services as a factor; its principal offices are in Chicago but it has an active office in New York City, located in the relevant period at 342 Madison Avenue.

Beginning about October 1959, there was a relationship between Foam and Heller. Between December 3, 1959 and January 17, 1961, Foam borrowed money from Heller.

■ Foam on January 17, 1961 filed a petition for an arrangement under Chapter XI of the Act (11 U.S.C. § 701 and following). On February 23, 1961, Foam was adjudicated a bankrupt on its own written consent. Plaintiff was thereafter appointed Trustee and, although he was not required to obtain authorization from the bankruptcy court (2 Collier on Bankruptcy (14th ed., cited hereafter as "Collier") 1746–47), he followed the better practice and obtained authority from a Referee to bring this action.

■ The period of time within which a bankruptcy preference can take place is four months before the filing of a petition initiating a proceeding under the Bankruptcy Act (11 U.S.C. § 96(a) (1)). Since the petition in this case was filed on January 17, 1961, the relevant period for determining whether there was a preference is from September 17, 1960 to January 17, 1961. Events occurring prior to this period are relevant to an understanding of the problems. Under Section 15 of the New York Stock Corporation Law, a preference could take place at any time; there was no limitation to a four months period. The Trustee here, however, in his complaint (para 7), in the pre-trial order (p. 13) and elsewhere has confined his claim to the same four months period of the Bankruptcy Act.

September 17, 1960 was a Saturday. Since no business was transacted on Saturday or Sunday, the figures would be the same at the opening of business on September 19 as at the close of business on September 16.

The answer of Heller contains two counterclaims. It was explained for Heller at trial (SM 663) that these were in fact "setoffs" and had been pleaded under Section 60c of the Act.

The three shareholders of Foam were Alexander Pathy, his wife Suzanne, and Marie Louise de Montmollin. Pathy was President and the chief figure for Foam in the events in suit.

Foam kept its books on the basis of a fiscal year of exactly thirteen periods of four weeks each, the weeks always ending on a Sunday. Its fiscal year ended on Sunday, January 3, 1960. The new fiscal year began on Monday, January 4, 1960, and ended on Sunday, January 1, 1961.

The accountants for Foam were Edward Isaacs & Company (Isaacs). They made an audit as of January 3, 1960, and an examination (not an audit) at the end of the first four periods of 1960 (April 24, 1960) and thereafter at the end of each three periods (July 17 and October 9, 1960 and January 1, 1961).

Before December of 1959 Foam had been financed by loans from two banks—First Philadelphia Company and Irving Trust Company—and by a factoring arrangement with Hubshman Factors Corporation.

In October 1959, Foam applied to Heller for financial accommodation.

The background for the application by Foam is of interest.

Foam rubber is made by one or the other of two patented processes, Dunlop and Tallalay. Foam itself had built a modern plant, ready in 1956, using the Dunlop process.

Serious competition to foam rubber began to be felt about 1955 from cheaper plastic foam made from polyurethane. This plastic competition affected sales to industrial users.

In December 1958, a competitor of Foam (B. F. Goodrich Co.) developed a new process, called "pincore", for producing foam rubber more cheaply and thus enabling foam rubber better to compete with polyurethane.

It was difficult to use the pincore technique with the Dunlop process and as the competitive situation evolved in 1959 Foam lost industrial sales to such an extent that its production for such sales, normally about two-thirds of total production, was sharply reduced. As part of meeting polyurethane competition, there was also a 20% price drop in foam rubber on July 15, 1959.

In the fall months of 1959 Foam was operating at about one-third normal production, nearly all for retail sales. Foam was trying to find a way of adapting the pincore technique to the Dunlop process.

In this situation, the shareholders of Foam increased their equity by putting in about $150,000 more capital. It was also decided to concentrate financing with Heller.

It was agreed in October 1959 that Heller would make an examination of the books and records of Foam, which was done. Heller in October 1959 had an independent appraisal made of the real estate at Burlington and the equipment at Burlington and Riverside. The value of the real estate was reported as $170,-000, the value of equipment at Burlington as $581,000 and at Riverside $45,000. Heller questioned two large equipment items—one of $65,000 (for mold conveyor) and the other (for molds) of $295,650—and was assured by the appraiser that the values were "auction", a "knock down appraisal", that the items had "an indefinite life and would have great value * * * in the industry". Heller further questioned the valuation of the molds and received from the appraiser information in writing, among other things, that the molds "will remain in excellent condition for years", that they were "standard throughout the foam rubber industry", that the value was placed on them "after a thorough investigation", and that the 'same line of reasoning' was used to state a value for the mold conveyor". The writing from the appraiser said that they "would lend themselves best to a negotiated sale within the industry".

Heller looked at the list of accounts receivable assigned to Hubshman for a month and found them "desirable", "reasonably well rated", and should "make up a sound receivable portfolio".

It appeared that Foam would suffer a loss in 1959 (for the reasons already given), that the loss was "temporary" so far as the price drop of 20% on July 15, 1959 was concerned, and that prices were going up and by "spring" of 1960 the 20% decrease would be eliminated. Heller felt that, without the financing then planned, working capital of Foam would be "practically nothing" but that

with the financial plan working capital would improve by $300,000. Heller felt that Foam was "strong enough and has a standing in the field so that it can weather the temporary loss and that it would be exceptional if anything drastic should happen to them" in the year following November 1959.

By agreements of December 3, 1959, Heller agreed to make three types of collateral loans to Foam: (1) a time loan of $500,000 secured by mortgages of the real estate, plant and equipment at Burlington and Riverside and further secured by pledge of warehouse receipts for inventory of $150,000 value; (2) demand loans against pledge of accounts receivable up to 80% of the face amount of such accounts; and (3) demand loans of not more than $450,000 against warehouse receipts for inventory deposited in a field warehouse up to ⅔ the value of such deposited inventory.

The $500,000 time loan was duly made on December 29, 1959, and the proceeds delivered to Foam. This time loan was agreed to be repaid, $100,000 on November 15, 1960 and the rest in monthly installments beginning January 15, 1961.

Foam transferred its factoring from Hubshman to Heller and began pledging accounts receivable and inventory on a daily basis to Heller.

The procedure followed as to inventory and accounts receivable loans was the same from December 3, 1959 to January 17, 1961 except where otherwise noted. This procedure should be explained.

Each day Foam assigned to Heller the accounts receivable (or nearly all of them) created that day. The assigned accounts were listed on a schedule. Heller then gave Foam a check for 80% of the face amount of the assigned accounts. No demand notes were given for this type of loan; apparently it was an open account, secured by the assigned receivables. No notice of assignment was given to customers and Foam collected the amounts due. However, checks received by Foam in payment of the as-signed accounts were under the agreement physically transmitted to Heller which collected them and gave a check to Foam for 20% of the amount collected, less any charges for interest (sometimes called a "service charge" etc.).

Loans against inventory were also on a daily basis. Lawrence Warehouse Company, a public warehouseman, leased part of the Riverside premises (and for a period other space across the street) and there, with its own employees, kept custody of inventory deposited by Foam, issued warehouse receipts therefor, and on consent of Heller released inventory from its warehouse custody to Foam. (Everything produced at Burlington was trucked to Riverside, from which it was shipped to customers.) Heller advanced to Foam 66⅔% of the value of inventory deposited by Foam. Foam could secure release of inventory by repaying to Heller the amount advanced against that inventory.

The agreement provided that Foam would give its demand collateral notes for advances against inventory and so far as appears this was done.

Since on any given day there were deposits of inventory by Foam and withdrawals of inventory by Foam, depending on the orders of customers to be filled and on other business reasons, it was not the practice to issue two checks, one by Heller to Foam for ⅔ of the value of inventory deposited and one by Foam to Heller for ⅔ of the value of inventory withdrawn. If ⅔ of the value of inventory deposited was in excess of ⅔ of the value of inventory withdrawn, then Heller gave Foam a check for the excess. If ⅔ of the value of the inventory withdrawn was in excess of ⅔ of the value of the inventory deposited, then Foam gave Heller a check for the excess.

For the year ended January 3, 1960, Foam had a loss of $298,125. Its balance sheet showed total capital of $1,006,041 and working capital of $658,359.

Isaacs financial reports were given to Heller by Foam not long after their receipt by Foam.

In March 1960, Pathy asked Peter E. Heller, a senior officer of Heller, for the loan by Heller of more money to Foam. The situation as presented to Peter concerned the solution by Foam in February 1960 of the problem of finding a method of making the high density, pincore type, foam rubber with the Dunlop process. Pathy believed that the process developed by Foam was a third process for making pincore type foam rubber, different from the pincore type made with Tallalay and Dunlop, that the discovered third process would reduce production costs, and would enable Foam to compete with polyurethane in the important industrial sales area. Pathy was so enthusiastic that he felt that the third process "might, and probably will, revolutionize the foam industry". (It should be added that Foam was also close to completion of another new process discovery, the "one piece" process.)

To put the new third process in production required more money and, as sales might lag until the third process was in production, Foam could not itself generate the new money required.

Heller considered the matter carefully. Peter made a special visit to Burlington and Riverside. At both places Peter was impressed with personnel (including impressive research staff), flow of production in good order, and labor relations. Peter was convinced that industrial sales would greatly increase with the third process (big sales to well known companies were expected) and that profit margins would widen; he also felt that there was considerable equity, that the extra loan would only be for a short term, and that Pathy had "a record of success behind him".

Heller decided to increase the loan.

By agreements made on March 24, 1960, Heller agreed to make further loans, payable on demand, up to $300,-000; these were often called "overloans". The overloans were to be secured by all collateral in the hands of Heller. It was specifically stated that Heller would "in all events expect and require" that the overloans be repaid by December 31, 1960.

At the same time in March, 1960, Heller and Foam agreed on two other matters, intended to make more money available to Foam: (a) the requirement was eliminated from the $500,000 time loan that warehouse receipts for inventory of $150,000 value be in pledge to secure that time loan; and (b) the inventory loan limit was increased from $450,000 to $500,000.

In return for Heller making more money available as described, the shareholders of Foam pledged to Heller their shares of Foam stock to secure all loans of Foam so long as any overloans were outstanding. The three shareholders also made a personal guarantee to Heller of all overloans above $125,000; in other words, if there were $125,000 in overloans unpaid, the guarantors were not liable for anything; if there were $175,-000 in overloans unpaid, the guarantors were liable for $50,000; and if there were $300,000 in overloans unpaid, the guarantors were liable for $175,000.

Under the March 24, 1960 agreements Heller advanced $300,000 against demand notes of Foam on the following dates (all in 1960) and in the following amounts:

| | |
|---|---|
| March 29 | $100,000 |
| April 11 | 50,000 |
| June 9 | 50,000 |
| June 24 | 25,000 |
| June 30 | 75,000 |
| | $300,000 |

These were the overloans.

In April 1960, the bonds of Foam in the amount of $15,000 held by one of the three stockholders (Mrs. de Montmollin) came due. Mrs. de Montmollin left the money in the company as a loan.

It was the practice of Heller about every three months to make "field examinations" by its accounting employees of the books and records of the companies

for which it acted as factor. These examinations were not audits. They were made according to Heller's own system, designed to meet the needs of factoring transactions and to permit the best analysis of the business situation.

Heller made a report on May 24 of such an examination of Foam as of March 27, the end of the first three periods in 1960. There was an operating loss in these periods of $20,875.75 and a drop in working capital of $82,534.20; working capital stood at $377,061.01.

In the week of June 20, there was an important Furniture Convention in Chicago. Foam made a big effort with an exhibition there, naturally promoting the new third process products. Peter met Pathy at the Convention and discussed prospects. It appeared that Foam had a "good reception", had been approached by Goodyear to make pincore type rubber, and could expect "larger industrial sales" to offset "somewhat smaller retail sales". Pathy was enthusiastic, advising Heller that the "new product * * * seems to be the best presently on the market".

Through the first six months of 1960, however, Foam was in a "tight financial situation", as Pathy put it, but on July 1 he believed—and so advised Heller—that, because production under the new third process would begin in July, the financial situation would be relieved about mid-August or September.

New process production did begin about July 6 but on a small volume, expected gradually to be increased.

In July, or possibly August (the record is not clear as to the time), three companies owned by Pathy advanced $65,000 to Foam.

By August 3, it was apparent that losses of Foam up to that point were greater than expected and despite Pathy's belief in the new process he felt for the full year Foam would do no better than break even or have a small loss; he was counting on increased sales volume the rest of the year from the new process. His problem in passing to the new process was aggravated by the decision at this time of two big producers of foam rubber to discontinue its production; this meant that their stock on hand had to be sold with consequent price depressing effect. Pathy believed his troubles would be over as soon as the inventories of producers who left the market "will have disappeared".

An unaudited Isaacs report of August 18 (sent to Heller on August 19 and described as "audited") showed operating loss of Foam to July 17 as $289,487 and net loss as $410,015, which probably includes depreciation.

In explaining to Heller the "very bad" results to July 17, Pathy told of "a few new bright spots" and emphasized the burden on Foam and on him of what he felt was a lack of capital in Foam. He felt that he was "racing against time" to achieve recovery from the new process before working capital was exhausted and he asked Heller to help "to solve for the future this lasting predicament of time and money". He offered to sell part of the equity if a buyer could be found but expressed himself as "more than ever optimistic and enthusiastic about next year's prospects".

A report of one of Heller's examinations was available on August 24. It also was to July 17. Loss before depreciation was given as $235,165.37; decrease in working capital was shown as $344,954.43; working capital stood (on July 17) at $114,140.78.

The significance of the Heller report as of July 17 is with respect to accounts payable of Foam. While they are shown as current as to $138,986.31, there is a footnote to this figure which explains that it does not include "$133,717.27 Bank overdraft reversed". This wording could cause confusion but the record is clear as to what it means. It does not refer to any actual overdraft at the bank. It refers to a practice, in existence from as early as July 17 at least, followed at Foam when there was not enough money to pay bills as they became due. Checks in payment of the bills would be written out but would

966

be held in a desk drawer until there was enough money in the bank account to enable the bank to honor them. Whether when the checks were drawn and not sent, entries were made in the ledger of Foam indicating payment of the accounts is not certain; probably such entries were made. But the Isaacs and Heller examiners, for their statement purposes, "reversed" any such entries and in effect showed the accounts as still payable.

Heller did not approve the practice and asked Foam to stop it.

There must be a finding that on July 17, 1960 and down to the date of bankruptcy, Foam could not pay its debts as they matured.

On August 25, Peter and Pathy discussed the overall situation. Pathy gave projections which showed that Foam could pay off the $300,000 overloan by the end of the year and could make the $100,000 payment due November 15 on the time loan. Peter said that Heller would consider asking for more collateral. Heller wanted to reduce the total amount of its loans to Foam but expected to continue the daily accounts receivable and inventory loans.

Peter and Pathy met together again on September 9 and Peter repeated earlier requests for more security. It is clear that Pathy felt that Foam was under heavy financial pressure. He argued with Peter in order to reduce the Heller demands. He assured Peter that Heller "would not lose on the liquidation of this operation" which looks as if liquidation had at least occurred to him by that time as a possibility. It is difficult for me to conclude that Pathy expected bankruptcy at this point; he was using an argument with a secured creditor, namely, "if I am wrong and liquidation proves necessary—contrary to my present beliefs—your present security protects you from loss, even in that extreme event". He referred to the $65,000 advanced to Foam by him to show that "he, himself, has not lost confidence in its operation". Peter advised Pathy "to negotiate for a sale".

In the middle of September, the three stockholders of Foam agreed that their pledge of their stock would secure any debts to Heller, whether any overloan was outstanding or not. This was an extension of the stock pledge made in March. At the same time, Heller, having learned of the $65,000 debt of Foam to the Pathy companies, asked that this debt be subordinated to the Heller debt. There is no proof that any of this debt was in fact subordinated. Pathy testified that as to one company there was subordination but that the due date of all the $65,000 was deferred.

On September 15, Pathy was "glad" to advise Heller that "finally sales have picked up in both divisions and I hope that the overloan and possibly part of the inventory loan will be paid by the yearend".

The projections for reduction of the inventory loan did not work out and in late September, specifically beginning September 20, Heller began to deduct a percentage of the remittances to Foam with respect to accounts receivable assigned and collected. The percentage stated in a letter of Peter was 21% but this was the deduction on only one or two days. The percentage deduction varied from nothing to about 15% and from September 20, 1960 to December 7, 1960, some deduction was normally made each day on the remittances for accounts receivable. Foam was using moneys obtained from assignments of accounts receivable and from collections of such accounts in order to obtain release of inventory from pledge. The amount of deduction was varied in order not to interfere with the availability of funds to Foam for that purpose.

In place of the percentage deduction, Pathy had suggested a flat $4,000 daily deduction; this would have been more than any daily deductions actually made.

By September, Foam had become the sole supplier of pincore type rubber to

Goodyear; in other words, Goodyear stopped producing foam rubber itself and bought from Foam. As the financial situation continued to be critical in the fall of 1960, Pathy began discussions with Goodyear to see if its strength could be enlisted.

On November 14, an Isaacs report was available for the year to October 9. This showed an operating loss of $280,495, a net loss of $466,075, and a working capital deficit.

On November 15, the $100,000 due to be paid by Foam on the time loan was not paid.

In late November, the discussions of Pathy with Goodyear became more active. Apparently Goodyear was interested and might "enter the picture" but how does not appear. Six people from Goodyear inspected Foam's operations and plants (November 25). Pathy was several times in Akron at the Goodyear offices. Goodyear asked Pathy to find out the financing charges Heller would make to carry the then debt forward and to supply "additional funds that Pathy could require, should Goodyear enter the picture and wish Pathy to make certain improvements on their behalf".

In attempting to keep Heller (and possibly others) interested and willing to help into 1961, Pathy was about this time making projections of what Foam would do in 1961. One such projection showed cash return for the year 1961 of $87,608, permitting $75,000 to be paid against debt; another showed $241,930, permitting $220,000 to be paid against debt.

Production at Burlington naturally depended on latex being available there, latex being the raw material. Foam bought latex from Goodyear, Firestone and Stein-Hall. There came a time when these suppliers declined to deliver further except against cash payment. Foam then obtained on credit a "one time" delivery of latex from Merton, to be paid for on December 17.

The situation being serious, Heller and Foam jointly arranged a discussion on Wednesday, December 7, between Foam, Heller and the two largest creditors (for latex). The object at the discussion was to find a way to keep Foam operating and to restore it to a healthy financial condition. The two latex creditors were Goodyear, owed about $200,000, and Stein-Hall, owed $258,375.15, of which $150,819 was (on 60 day terms) past due. Apparently Firestone had disappeared from the scene. The third latex creditor was Merton, not represented at the discussion but owed $84,000 due December 17. The tentative plan was for the three latex creditors to postpone their then due accounts to the end of 1961, for Goodyear to give up any setoff against amounts due on products bought from Foam by Goodyear, and pending final approval of such plan, for a new appraisal to be made by a different independent appraiser. For such a plan to succeed, it was essential to secure the agreement of Merton to postpone to the end of 1961 payment of the $84,000 due December 17, 1960; Pathy was to get Merton "to stand by". It was recognized that during the "crisis period" it would be necessary to keep current (to pay) "those creditors who must be kept current in order to avoid calamity", that is, bankruptcy.

On December 7 or a day or two later, no more latex was available at Burlington because no supplier would deliver it on credit. Production ceased at Burlington on this account and was never resumed. (Burlington shut down normally before Christmas for a week or ten days.)

Production continued at Riverside, selling continued and delivery of orders; this activity was never stopped until the adjudication. Heller continued to lend money on accounts receivable and inventory and Foam continued to withdraw inventory from pledge.

A report of a Heller examination was available on December 9 for the year to October 9. The writing and holding of checks (inability to pay due debts) had continued. Operating loss was $323,-358.88; there was a working capital deficit of $239,087.53.

Discontinuance of Burlington production, had it been only temporary, might have been beneficial because it forced reduction of inventories.

Pathy believed that operations at Burlington could and should be resumed in the first week in January. A new purchase order was received from Goodyear for its requirements to March 31, 1961 (without setoff). Interest in buying was displayed by Textron.

Pathy was attempting to persuade Merton to go along with the "moratorium" plan considered at the December 7 discussion. Undoubtedly he was (as usual) optimistic and on December 23 reported to Peter that he had Merton "lined * * * up to be present at our next meeting".

There was in fact no reason for optimism. Merton commenced action in the New York Supreme Court on December 28 on its overdue account.

Pathy continued to negotiate for help from Goodyear and was in Akron on December 29.

He continued to try to secure agreement from Merton and was under the impression that they would go along. For "emergency purposes" a petition was prepared for an arrangement under Chapter XI of the Act.

In January Pathy was continuing to negotiate with Goodyear in Akron. He testified that he was close to completing a lease of plant and equipment to Goodyear for 5 years for $500,000 per year and that the lawyers were preparing a lease but the deal did not go through.

The time to answer the Merton complaint expired on January 17, 1961. According to Pathy's testimony, Merton "promised * * * to give us a delay beyond January 17th so that we could continue our discussions" but "in the last moment they changed their mind".

Foam had no defense to the Merton action and could not file an answer. Therefore on January 17th petition under Chapter XI was filed in this Court.

It is a fair inference that a petition for an arrangement was filed because Pathy still had hopes that Merton could be persuaded. Finally seeing that this was impossible, Foam consented on January 21 to an adjudication and on January 23 the adjudication was made.

Except for the deductions above described in the period September 20–December 7, 1960, there had been no changes from December 3, 1959 through January 17, 1961 in the daily procedures for advances and remittances by Heller to Foam.

On January 17, 1961, Foam owed Heller the following amounts:

| | |
|---|---|
| $ 500,000.00 | Time Loan |
| 504,806.82 | Inventory loans and overloans ($113,909.09) |
| 275,858.60 | Accounts receivable loans |
| $1,280,665.42 | |

The security in the hands of Heller on January 17 was liquidated and resulted in the following recoveries:

| | |
|---|---|
| $176,680.82 | from auction sale of real estate at Burlington and equipment at Burlington and Riverside |
| 420,990.00 | from sale of inventory pledged |
| 219,679.01 | from collection of accounts receivable assigned |
| $817,349.83 | |

The record does not show how much interest was owing to Heller on January 17 but does show (Ex. X) that on January 13 interest of $12,245.93 was due.

The Trustee may not recover under Section 60b of the Act because he has failed to prove an essential element for the avoidance of any preference, namely, that Heller, within the four month period, had (in the words of Section 60b) "reasonable cause to believe that the debtor is insolvent".

Under the Act, the test of insolvency is the "balance sheet" test, namely, whether or not "at a fair valuation" the assets exceed the liabilities. Section 1(19) of the Act; 11 U.S.C. § 1(19).

From September 17, 1960 to January 17, 1961, and according to the evidence in this record, Heller did not have reasonable cause to believe that Foam was insolvent in the sense that, at a fair valuation, its liabilities exceeded its assets.

The situation under Section 15 of the New York Stock Corporation Law stands differently. In relevant part that section (until repealed effective September 1, 1967):

"No * * * transfer of any property of any * * * corporation * * * when the corporation is insolvent or its insolvency is imminent, with the intent of giving a preference to any particular creditor over other creditors of the corporation, shall be valid * * *".

Unlike the test under the Act, the test of insolvency under Section 15 is whether or not the corporation is able "to pay and discharge obligations in the ordinary course of business". Cohen v. Sutherland, 257 F.2d 737, 743 (2d Cir. 1958).

Under this test, Foam was insolvent from as early as July 17, 1960. This follows from the finding already made.

Section 15 is available to the Trustee to avoid a preference if there is a "creditor of the debtor, having a claim provable under this Act". Section 70e (1) of the Act, 11 U.S.C. § 110e(1). It was stipulated at trial (SM 171–72) that there were at least five creditors of Foam who did in fact file claims. Of these, one (a company owned by Pathy) may have been unable to invoke Section 15 because of the subordination agreement but it is clear that the others could have invoked Section 15 and the section is thus available to the Trustee.

The other elements necessary for the Trustee to establish in order to obtain recovery under Section 15 are:

a. that Foam intended to give a preference;

b. that Heller had notice or reasonable cause to believe that it was being given a preference; and

c. that in fact a preference was given.

Irving Trust Co. v. Chase Nat. Bank, 72 F.2d 668 (A. N. Hand, J., 2d Cir. 1934).

There is great difficulty to determine whether in the period after September 17, 1960, Foam intended to give a preference to Heller. The person who acted for Foam in this connection was Pathy. The issue is as to his state of mind: did he intend to prefer Heller over his other creditors? In deciding this issue, of course it must be remembered that a person does intend the natural consequences of his acts.

After September 17, the transfers of which the Trustee here complains are assignments of accounts receivable and pledges of inventory; out of the total of all such transactions the Trustee finds a "net flow of consideration to Heller" (Ex. 45).

This is a fundamental error of the Trustee. The assignments of accounts receivable and pledges of inventory within the four month period were "for money loaned, a present consideration, and were not preferential under

Section 60 of the Bankruptcy Act * * * ". Wolf v. Aero Factors Corp., 126 F.Supp. 872, 883 (S.D.N.Y.1954), affirmed 221 F.2d 291 (2d Cir. 1955). The transfers of which the Trustee complains thus could not possibly be preferences. I leave to one side that *collections* by the creditor on the assigned security in excess of the loan and *application* of the excess to a debt antecedent the four month period can be a preference, as shown in the *Wolf* case itself. It should also be noted that the *Wolf* case did not involve an intent to prefer under Section 15.

The situation here then is that Pathy was making the transfers against receipt of present consideration and he was doing this, not to prefer or in any way to benefit Heller but to get funds in order to keep the business running and move into the recovery which his enthusiasm and optimism led him to expect and a result of which would have been payment to all creditors.

The chief decisions as to the Section 15 intent to prefer seem to be Matters v. Manufacturers Trust Co., 54 F.2d 1010 (L. Hand, J.; 2d Cir. 1932); Dalziel v. Rosenfeld, 265 N.Y. 76, 191 N.E. 841 (1934); Irving Trust Co. v. Chase Nat. Bank, above cited.

In *Irving Trust Co.*, above, it was found that there was no intent to prefer; in the other two cases, there was no contemporaneous consideration for the payments questioned.

In a situation such as this, where the debtor is securing fresh benefits urgently desired, it seems to me virtually impossible to find an intent to prefer the creditor conferring the fresh benefit.

Pathy denied from the stand any intent to prefer Heller over other creditors (SM 133, 134). I accept his testimony.

If there be error in my conclusion, it would seem to be possible only by reason of knowledge by Pathy of the inevitability of bankruptcy. The colorful language of Judge Learned Hand in the *Matters* case, above, 54 F.2d at 1014, is apt:

"It is still a preference if a debtor, knowing that he is insolvent, selects one creditor, though he believes that he may not go to the wall, if the dice fall right. He must actually believe that the gods will smile; it is not enough that their faces are inscrutable."

Here, as already indicated, Pathy did not select Heller for any preference and certainly he believed that the "gods will smile".

In Dalziel v. Rosenfeld, above, 265 N.Y. at 80, 191 N.E. at 842, it was said that a transfer was with intent to prefer if made when bankruptcy was the "natural, probable and only foreseeable end".

The earliest date on which I could find that bankruptcy was the "natural, probable and only foreseeable end" is December 7, 1960.

I will assume for present purposes that after December 7 Pathy had the intent to prefer Heller required by Section 15 and that assignments of accounts receivable thereafter would be preferences, except for the giving by Heller of new consideration.

On this assumption, if there were collections made by Heller of accounts receivable assigned after December 7 and if those collections were in excess of the amounts loaned against those accounts, Heller could apply the excess to loans made after December 7 or to interest on such loans. Such is the teaching of *Wolf*, 126 F.Supp. at 883, 221 F.2d 291, 292. If Heller made application of any such excess to any debts other than those just described, there was, presumptively at least, a preference. But the Trustee did not prove that in fact there was any such application made by Heller.

The Clerk is directed to enter judgment in favor of defendant.

So ordered.