**TELEFEST, INC., Plaintiff,**

v.

**VU–TV, INC., Defendant,**

**Manufacturers Hanover Trust Company and Barton Press, Inc., Intervenors.**

**Civ. A. No. 83–694.**

United States District Court,
D. New Jersey.

Aug. 6, 1984.

Stryker, Tams & Dill by Richard Zayas, Newark, N.J., for plaintiff.

Greenberg, Dauber & Epstein by Melvin Greenberg, Newark, N.J., for intervenor, Manufacturers Hanover Trust.

Sills, Beck, Cummis, Zuckerman, Radin & Tischman by Richard Trenk, Newark, N.J., for intervenor, Barton Press, Inc.

## OPINION

BARRY, District Judge.

The question before the court is whether a security agreement executed on May 6, 1983 for the benefit of intervenor Manufacturers Hanover Trust ("MHT") by defendant VU–TV, Inc. ("VU–TV") and by the company of which VU–TV is a wholly-owned subsidiary, CATV Products, Inc. ("CATV"), constituted a fraudulent conveyance within the meaning of the Uniform Fraudulent Conveyance Act ("UFCA"), as adopted by New Jersey, 25 N.J.S.A. 2–7 through 2–19 ("NJFCA"). If that conveyance was fraudulent, MHT will be impaired to the extent of the fraud in asserting what is otherwise a priority security interest in funds being held by Graphic Scanning, Inc. ("Graphics") for the benefit of VU–TV.

Plaintiff TeleFest, Inc. ("TeleFest") seeks to recover a portion of those funds to recompense the violations of a licensing agreement that it had with defendant VU–TV. Barton Press, Inc. ("Barton"), is a judgment lien creditor, seeking to recover on a contract breached by VU–TV. For the reasons set forth below, I conclude that TeleFest and Barton have failed to prove that the security agreement between MHT and VU–TV amounted to a fraudulent conveyance.

TeleFest entered into a licensing agreement with VU–TV on March 22, 1982. TeleFest licensed to VU–TV the world-wide distribution rights of videotapes of musical performances given at the ChicagoFest Blues Series in 1981. VU–TV agreed to pay TeleFest seventy percent of the gross proceeds of world-wide sales, with a minimum payment of fifty thousand dollars. Simultaneously, the two parties agreed

that, in consideration of $7500, VU–TV would distribute another videotape, "Cheap Trick Live at ChicagoFest".

Alleging that VU–TV failed to pay the specified guaranteed amounts and to perform other contractual obligations, TeleFest brought this action on March 4, 1983. VU–TV failed to answer or otherwise appear and, on April 8, 1983, TeleFest was granted an Order of Final Judgment against VU–TV for $57,500, plus costs.

■ Barton obtained a default judgment against VU–TV on April 19, 1984 in the Superior Court of New Jersey in the amount of $85,323.86. It attempted to levy on that judgment on June 11, 1984, but found that the VU–TV account receivable held by Graphics was affected by restraints imposed by this court on November 22, 1983. Barton sought permission to intervene under Fed.R.Civ.P. 24(b).[1] Notwithstanding the fact that Barton is not indispensable, the motion to intervene was granted because Barton's claim and the main action involve common questions of law and fact.

MHT claims that its security agreement has priority over the judgments of both TeleFest and Barton. The basis for its claim is set forth in the affidavit of MHT Senior Vice-President Joseph Adamko, dated June 4, 1984. According to that affidavit, CATV's predecessor, Gamco Industries, Inc., opened an account and obtained a secured loan from MHT on May 15, 1980. In November, 1980, Gamco sold its assets and changed its name to CATV. The Gamco loan was repaid by January, 1981. In July, 1981, MHT, a New York banking association, agreed to extend a $100,000 unsecured line of credit to VU–TV at two percent over the prime rate of interest in exchange for the personal guarantees of VU–TV's Treasurer, Martin Horak, and its Secretary, Leon Poitrais, and the cross-corporate guarantee of CATV.

An MHT "Credit Facility Review" was conducted in March and April, 1982 in connection with a plan of Horak and Poitrais

and a VU–TV and CATV stockholder, Ted Leder, to obtain a $300,000 loan to purchase San Antonio Home Entertainment, Inc. ("San Antonio"). A statement entitled "Credit Department Review", dated March 12, 1982, was issued as part of that effort. The statement described VU–TV's business, its financial condition, and the results obtained through the end of September, 1981 by the company. It concluded that VU–TV was a "company which has recorded strong sales growth and sizeable profit margins, and earnings have been reinvested to increase its equity base." The reviewer also noted that the corporate officers were highly expert and experienced and that the company was positioning itself for expansion to European markets.

MHT agreed to provide the requested loan, but cross-corporate guarantees were to be executed by VU–TV, CATV and San Antonio with each company cross-collateralizing with all assets, including receivables, the loans of the other companies. The collateralization was to cover all outstanding loans, including those that had previously been unsecured. A general security agreement was to be executed and filings on the companies' assets made. In May, 1982, the cross-guarantees of the companies and related documents, prepared by MHT's legal department, were supposedly sent to Horak. Loans were also extended in April and May, 1982 to CATV, which received $300,000, and to San Antonio, which received $20,000.

VU–TV and CATV's cross-guarantees and the UCC filing statements were not executed with the other documents in May and June, 1982. MHT is unable to account for this lapse, but believes that it either failed to prepare those documents, did not receive them back from Horak, or received the documents executed, but "misplaced" them. MHT discovered "sometime in early 1983" that it did not have the desired guarantees. An MHT "Interoffice Letter", dated January 20, 1983, requested the MHT

---

**1.** Diversity jurisdiction, once created, is not destroyed by the permissive intervention of a nonindispensable party, *Harris v. Illinois-California*

*Express, Inc.,* 687 F.2d 1361 (10th Cir.1982); *CRI, Inc. v. Watson,* 608 F.2d 1137 (8th Cir. 1979).

Legal Department to prepare guarantees and UCC filings for VU–TV, CATV and San Antonio.

The loans that had been made to the related companies were renewed by MHT at each maturity date and further loans extended. As of January, 1983, CATV owed MHT $450,000, VU–TV owed $50,000 and San Antonio owed $17,000. By June, 1983, the loan balances had been reduced, and CATV owed $385,000, VU–TV owed $50,000, and San Antonio owed $15,000. Although MHT filed financing statements for VU–TV accounts receivable on April 15, 1983 with the Clerk of Middlesex County, New Jersey, and on April 18, 1983 with the Secretary of State of New Jersey, it was not until May 6, 1983 that CATV executed a "Guarantee of all Liability and Security Agreement" ("Guarantee"). VU–TV executed a similar agreement, thereby cross-collateralizing the loans extended to the related entities.

A second affidavit of Mr. Adamko, dated October 19, 1983, avers that all of the notes executed by VU–TV and the related entities in favor of MHT are in default. Adamko asserts that because MHT filed its financing statements before TeleFest had the United States Marshal serve a writ of execution upon Graphics—a corporation holding certain monies for the benefit of VU–TV—on June 22, 1983, MHT has a priority of security interest and is entitled to collect any monies held by Graphics for the benefit of VU–TV, up to a total of $450,000.

TeleFest contests the priority of security interest on a number of grounds, one of which is TeleFest's assertion that because MHT obtained the security agreement from VU–TV after the entry of TeleFest's default judgment against VU–TV without fair consideration and at a time when the latter was already insolvent, MHT was the grantee of a fraudulent conveyance within the meaning of the UFCA, as adopted in New Jersey.

TeleFest argues and MHT does not dispute that the security agreement of May 6, 1983 constituted a "conveyance" under § 2–7 of the NJFCA. There is no doubt that, at the very least, the security agreement involved the pledge of "intangible property" pursuant to that section.

The NJFCA contains a provision covering conveyances made where an actual intent to hinder creditors exists, N.J.S.A. 25: 2–13, and provisions covering conveyances that are deemed fraudulent without reference to intent. N.J.S.A. 25:2–10 through 12. TeleFest abjures any attempt to prove that there was an intent to defraud creditors when the security agreement was executed, but relies on the three provisions of the NJFCA which read as follows:

25:2–10. What constitutes insolvency fraudulent

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

25:2–11. Conveyances by persons in business without fair consideration

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

25:2–12. Incurring debts beyond ability to pay

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends to or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

TeleFest argues that to the extent that VU–TV's security agreement guaranteed debts incurred by CATV and San Antonio, the agreement was a conveyance or obligation incurred without fair considera-

tion.[2] However, separate and apart from the issue of fair consideration, TeleFest is obliged to show that VU–TV was insolvent at the time of the conveyance to MHT because, in actions to set aside a conveyance as fraudulent to the creditors of the grantor, the burden of proving fraud rests upon the plaintiff. *Palestroni v. Jacobs,* 18 N.J.Super. 438, 87 A.2d 356 (App.Div. 1952). *See also Epstein v. Bendersky,* 132 N.J.Eq. 30, 26 A.2d 247 (1942).

TeleFest claims that affidavits which it has submitted, when considered together, show that VU–TV was insolvent on May 6, 1983. In an affidavit of December 15, 1983, Gregory Roselli, TeleFest's president, states that TeleFest was aware of VU–TV's "serious financial problems" as early as November, 1982. Roselli relates that on November 13, 1982, Robert Sewak, VU–TV's acting president, asked Roselli to cancel the TeleFest/VU–TV contracts because of these problems. The following month, Sewak resigned and, according to Roselli, in January, 1983, Leon Poitrais, VU–TV's new president, informed Roselli that VU–TV had insufficient funds to pay TeleFest. During the same month, Cynthia Friedland, a television industry official, allegedly told Roselli that VU–TV was in "grave financial difficulty."

Roselli states that in February, 1983, he spoke with Sewak, who told him that VU–TV was "broke" as of December, 1982 and was still "broke." Roselli further relates that, in March, 1983, he met with one Walter Baxter, who had been VU–TV's president in early 1982. Baxter told him that VU–TV had the industry reputation of "being 'dead'". Roselli spoke with Sewak again in April and May, 1983 and Sewak told him that VU–TV's only asset was money owed it by Graphics. These conversations convince TeleFest that VU–TV was, at the very least, in serious financial straits at the time that it signed the security agreement.

TeleFest also submits the affidavit of Robert Sewak, dated January 19, 1984. Sewak states that during the period April 1, 1982 to December 31, 1982, he was a paid consultant to VU–TV with complete access to that company's accounts, contracts and operating statements and that in November, 1982 he met Roselli and told him that VU–TV did not have the funds to pay its obligations to TeleFest under the contract. He further states that, at that time and, to his knowledge, thereafter, VU–TV did not have sufficient funds to pay all of its creditors and that in December, 1982, VU–TV had "debt ... in excess of foreseeable income." Sewak adds that the debt to at least seven studios and some duplicating houses caused those businesses to refuse to work for VU–TV without pre-payment. Sewak also claims that Poitrais told him in 1983 that the company lacked sufficient funds to pay Poitrais' regular salary.

The April 26, 1984 affidavit of Leonard Cohen, Director of Engineering for VU–TV from January through August, 1983, confirms that VU–TV had problems meeting its payroll during 1983. Cohen states that many of his payroll checks were returned for insufficient funds and that he was told by VU–TV's landlord and by "various officers of VU–TV" that, beginning in April, 1983, the company stopped paying rent that it owed for its office space. Additionally, Cohen asserts that in April, 1983 and throughout the rest of his tenure at VU–TV, studios, duplicating houses and other trade creditors were also not paid sums owed them. A Notice of Levy, dated January 11, 1984 and filed by the Internal Revenue Service, indicates that VU–TV was unable to pay its employment taxes for the tax periods ending in March, September, and December, 1982 and March, June, and September, 1983.

An affidavit of Elsie Beckenback, dated April 30, 1984, supports the claim that VU–

**2.** N.J.S.A. 25:2–9 states that fair consideration is given for property or an obligation:

a. When in exchange for such property or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied; or

b. When such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation obtained.

TV was having difficulty paying its rent in the spring of 1983. Beckenback is the accounts receivable clerk of Summit Associates, Inc., an entity related to Raritan Plaza III, Inc., which had entered into a lease with VU–TV in July, 1982. According to Beckenback, VU–TV owed the landlord more than twenty-eight thousand dollars in rent on May 6, 1983 and another nine thousand became due and owing on June 1, 1983. An action for non-payment of rent was filed by the landlord against VU–TV in the Middlesex County District Court on September 28, 1983. By the fall of 1983, VU–TV's business offices had been closed and its telephone and electric services terminated. *See* affidavit of Richard Zayas, dated November 22, 1983.

Plaintiff's counsel, Richard Zayas, in an affidavit dated May 10, 1984, provides the results of a twenty-year judgment search that was performed with regard to VU–TV and states that three judgments were entered against the company in February, 1983. Cinaco Television obtained a judgment for $101,633.84 on February 17, 1983, I.T.C. Entertainment, Inc. obtained a judgment for $19,944.34 the following day, and Lexington Broadcast Services Co., Inc., obtained a judgment for $19,042.93 on the same date. TeleFest, of course, had a judgment for $57,580. Thus, on May 6, 1983, judgments totalling almost $200,000 had been entered against VU–TV.

TeleFest also submits the report of R.G. Harris, an official of MHT, concerning a January 17, 1983 meeting with Horak and Leder at which the results of a recently completed MHT audit were discussed. The report set forth the outstanding debt of the related companies to MHT, noting that the $517,000 total represented a $50,000 increase approved at the meeting by Adamko, Harris and one R.P. Phelan, another MHT Vice-President, and recited the personal guarantees, cash and securities collateral held by MHT. Harris also stated that "We hold most of the appropriate cross-corporate guarantees. Our legal department is currently preparing the guarantees that will complete the circle." [3]

Finally, TeleFest and Barton submit the report of Roger L. Day, a certified public accountant, dated June 22, 1984. Day examined a number of VU–TV business documents and records, including financial statements as of March 31, 1982 and an unadjusted trial balance of December 31, 1982. Two "tests of solvency" are included in the reports (Schedules 1 and 2). From the test at March 31, 1982, Day estimates that VU–TV's liabilities, absolute and mature, amounted to $918,295, while the fair, saleable value of its assets was $701,678, an apparent deficit of $216,617. Day's test of solvency at December 31, 1982 enabled him to give an estimate of assets with a fair, saleable value of $451,647 and a "tentative" estimate of liabilities, absolute and matured, of $866,049, for an "apparent" deficit of $412,402.

These estimates suffer from two problems. First, they do not include data that relates to the relevant date for the determination of insolvency, which is "undoubtedly the date of transfer—the date on which the obligation is incurred or the date on which the lien is granted in the assets." Rosenberg, *Intercorporate Guaranties and the Law of Fraudulent Conveyances: Lender Beware*, 125 University of Pennsylvania L.Rev. 235, 252 (1976).

Second, the "tentative" estimates are based upon a host of assumptions, scrupulously listed by Day in accordance with contemporary accounting practices. For example, Day assumes that over $750,000 owed VU–TV by its parent is not collectible

---

**3.** TeleFest offers the affidavits and other documents described above under Federal Rule of Evidence 803(24) which states an exception to the hearsay rule for statements of "equivalent circumstantial guarantees of trustworthiness", as compared to the other exceptions contained in Fed.R.Evid. 803, if

the court determines that (A) the statement is offered as evidence of a material fact; (B) the

statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the evidence.

because CATV was allegedly insolvent at the end of 1982, but no documentary evidence of such insolvency is included with the Day report. Equipment and other fixed assets are arbitrarily assigned "fair, salable" values that are one-half the more than $125,000 listed for them in the unadjusted trial balance. Yet many of these fixed assets, such as furniture and automobiles, were almost new at the end of 1982. Leasehold improvements of some $25,000 are assumed to have no value.

The largest accounts receivable listed in an evaluation thereof are not listed as fair, saleable assets as of December 31, 1982 because of exceptions taken by customers in response to confirmation letters sent by VU–TV. Regardless of what portion of the amount claimed by VU–TV was excepted to by the customer, the entire account receivable is disregarded in the Day estimate. *See* Schedule 3. Those accounts receivable listed as "denied" by customers and not assigned any value by Day amount to over $400,000. It is not obvious that these disputed accounts receivable were valueless. In fact, accounts receivable are often assigned precisely because they are disputed. Many other dubious assumptions are employed.

Day's report may represent the best estimate that could be made with the admittedly limited data available to him but that

estimate is one made with reference to dates that are fourteen and five months earlier than the relevant date and is based on assumptions that are at least open to question. The report, therefore, cannot be given the weight that an auditor's report would usually merit in deciding the question of insolvency.[4] The nature of the business in which VU–TV was engaged, one that heavily relies on accounts receivable, together with its recordkeeping practices, make it peculiarly difficult to obtain the type of evidence that an accountant would need to accurately determine solvency as of a given date.

TeleFest argues that the test of insolvency is whether the corporation is able to pay and discharge its obligations in the ordinary course of business, citing *Ackman v. Walter E. Heller & Co.,* 307 F.Supp. 958 (S.D.N.Y.1968) and *In re Elkay Metal Turnings Corp.,* 190 F.Supp. 660 (E.D.N.Y. 1961); that fraud with respect to a particular conveyance may be found if a corporation was insolvent or heavily indebted and subject to pending or anticipated litigation, *Douglas v. First National Realty Corp.,* 351 F.Supp. 1142 (D.D.C.1972); and that liability for taxes, interest and penalties, even if unknown at the time of a transfer, must be taken into account in determining whether a transferor was insolvent at the time that a specific transfer was made.

**4.** MHT has submitted an affidavit of Anthony W. Forns, dated June 26, 1984, in which Forns, a certified public accountant with the firm of J.H. Cohn & Company, reviews the documents submitted by Day. Forns indicates that Day had not audited, reviewed or compiled VU–TV financial statements in accordance with American Institute of Certified Public Accountants standards, nor had Day reported on any financial information, but rather had supplied a letter based on limited available information, estimates and assumptions, together with supporting schedules. Forns concludes that the information and schedules were insufficient to determine whether the assumptions made by Day are correct. As an example, Forns notes that the value of automobiles purchased by VU–TV was depreciated from $59,288 on March 31, 1982 to $9,266 on December 31, 1982. Altogether, the assumptions and estimates made by Day are not seen by Forns as providing the basis for reaching any conclusion as to the solvency of VU–TV at either of those dates, and Day's conclusions

must be regarded as tentative and preliminary. TeleFest and Barton presented the court with a lengthy apologia for Day's report in which they noted that Day had to evaluate VU–TV's financial condition despite missing books and records. Specific defenses are made of Day's evaluation of the worth of accounts receivable on the basis of saleability, particularly with regard to denied accounts receivable, his evaluation of unsecured debts of entities in bankruptcy, his extrapolation of his conclusions from December 31, 1982 to the situation in existence on May 6, 1983, his failure to ascribe any value to an account receivable from CATV to VU–TV, and his fixing of the sale value of important assets at 50 percent of book value. It is apparent that, however valid the practices employed by Day in reaching the component figures of his report, all of his work was based upon either an unadjusted trial balance or an accountant's compilation report that was itself premised on a number of not easily testable assumptions.

*United States v. 58th Street Plaza Theatre, Inc.*, 287 F.Supp. 475 (S.D.N.Y.1968).

■ The NJFCA, 25 N.J.S.A. 2–8, contains a definition of insolvency:

A person is insolvent when the present fair saleable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured.

*See also Sokol v. Fidelity Union Trust Co.*, 138 N.J.Eq. 429, 48 A.2d 207 (1946) (insolvency denotes general inability to meet pecuniary liabilities as they mature by means of either available assets or honest use of credit). Where a corporation does not have significant capital assets to offset working capital deficits, it is insolvent within the meaning of that Act. *Francis v. United Jersey Bank*, 162 N.J. Super. 355, 392 A.2d 1233 (Law Div.1978), *aff'd* 171 N.J.Super. 34, 407 A.2d 1253 (App.Div.), *aff'd*, 87 N.J. 15, 432 A.2d 814 (1981).

MHT argues that the burden of proof of insolvency is upon TeleFest, who must show insolvency on the date of the conveyance. *Johnson v. Lentini*, 66 N.J.Super. 398, 404, 169 A.2d 208 (Ch.Div.1961); *Dunham v. Cades*, 115 N.J.Eq. 290, 292, 170 A. 656 (E. & A.1933).[5] It contends that Tele-Fest has failed to meet this burden and that the June 4, 1984 Adamko affidavit dispels any notion that VU–TV was insolvent in May, 1983. Adamko indicates that MHT received a $15,000 payment from CATV on May 23, 1983 and a $5,500 payment on August 18, 1983. These payments brought the notes of CATV, VU–TV and San Antonio up to date. The companies made no further reductions on their loan balance until April 23 and April 27, 1984 when MHT recovered $160,205.10 from a Money Manager Account in the name of Theodore Leder and two Time Deposit Accounts in the name of CATV that had been pledged to MHT as collateral. However, MHT contends that Horak had represented to MHT, and Graphics had confirmed, that monies due to VU–TV from Graphics would cover VU–TV's loan obligations. Moreover, MHT considered the loan to VU–TV to be "booked" to it only for internal accounting purposes. MHT insists that the loans were made to "a consolidated entity" through cross-corporate guarantees.

MHT also argues that the evidence that TeleFest has presented by way of affidavits is replete with hearsay, does not represent the knowledge of VU–TV's corporate officers or accountants, and lacks any breakdown of VU–TV's assets and liabilities, either at the time the loans were made or at the time of the execution of the guarantee. MHT views the Roselli and Sewak affidavits as particularly characterized by hearsay and questions TeleFest's failure to confirm the statements of declarants through depositions or interrogatories. It argues that the Beckenback affidavit fails to establish anything other than that VU–TV's landlord claimed that it was owed money by VU–TV and sued on that claim. No proof is offered concerning the outcome of that suit and MHT questions whether the landlord would bother to sue if it believed that its former tenant were insolvent. The Cohen affidavit is also characterized by MHT as consisting largely of hearsay and failing to specifically establish what payroll checks issued by defendant were returned, much less that VU–TV was insolvent at the time the checks were issued.

■ MHT is correct in arguing that New Jersey has long required that there be "ad-

---

5. It is, of course, possible under the UFCA for a corporation to be rendered insolvent by the very loan that is being scrutinized as a putative fraudulent conveyance. *See* N.J.S.A. 25:2–10 and 25:2–12, *supra.* However, in instances where, as here, multiple parties guarantee an obligation, since each of the guarantors generally has a right of contribution from the other guarantors, contemporary thinking allows that the contingent right of subrogation and contri-

bution are valuable assets which frequently offset the liability incurred. *See In re Ollag Construction Equipment Corp.*, 578 F.2d 904 (2d Cir.1978) (bankruptcy case); Note, *The Efficacy of Guaranty Contracts on Sophisticated Commercial Transactions,* 61 North Carolina L.Rev. 655, 679–680 (1983) (applicability of *Ollag* principle to non-bankruptcy purported fraudulent conveyances).

equate testimony" and "competent proof" of the liabilities and assets of an alleged insolvent. *Dunham v. Cades, supra* at 293–294, 170 A. 656. It has been said that "Fraud will not be presumed and circumstances that merely arouse suspicions will not support an inference of fraud." *Glasser v. Feller*, 141 N.J.Eq. 90, 91, 56 A.2d 137 (Ch.1947). Moreover, it is incumbent on one who seeks to set aside a transfer to disclose that, at the time of the transfer, the transferor was insolvent or was thereby rendered insolvent. It will not suffice to disclose that at some subsequent time the transferor was or became insolvent. *Id.*[6]

■ MHT is also correct in arguing that insolvency is a question of fact that cannot lightly be taken from the jury. *Kaufman v. Tredway*, 195 U.S. 271, 273, 25 S.Ct. 33, 34, 49 L.Ed. 190 (1904); *In re Roco Corp.*, 701 F.2d 978, 981 (1st Cir.1983); *See also Constructora Maza, Inc. v. Banco de Ponce*, 616 F.2d 573, 576 (1st Cir.1980); *Klein v. Tabatchnick*, 610 F.2d 1043, 1048 (2d Cir.1979); *Braunstein v. Massachusetts Bank & Trust*, 443 F.2d 1281, 1284 (1st Cir.1971). This is particularly true where, despite some indicia of insolvency, the transferor continues its business, *see Freehling v. Michigan Repacking and Produce Company*, 426 F.2d 989 (5th Cir. 1970), because the circumstance that liabilities exceed assets does not necessarily lead to the conclusion of insolvency if a corporation is actively pursuing its regular business with a reasonable expectation that business conditions will improve and that it will be re-established on a sound financial basis. *Hersh v. Levinson*, 117 N.J.Eq. 131, 137, 171 A. 736 (1934).

■ It is readily apparent then that Tele-Fest has a heavy burden to show insolvency as the first step in proving a fraudulent conveyance. It has gone some distance in meeting that burden, but hardly far enough to warrant the conclusion that no reasonable jury could find other than that VU–TV was insolvent on May 6, 1983. MHT's characterization of many of the statements in the affidavits presented by TeleFest as hearsay is an accurate one, and it is far from obvious that the material obtained "is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." Fed.R.Evid. 803(24)(B).

There is simply not the abundant clarity, provided through a balancing of available assets and expected liabilities, that on the date of the transfer the grantor of the conveyance was unable to pay its debts as they became due. The most that can be said is that there is evidence that VU–TV may have been paying some debts, e.g. those to the bank, but not others, e.g. rent and wages, as they became due. I cannot say that, as a matter of law, that the state of VU–TV's finances amounted to insolven-

---

**6.** Barton points to specific portions of the May 23, 1984 deposition of Martin Horak as indicating that VU–TV was and is insolvent. Horak stated that VU–TV's only account receivable was that of Graphics, which Horak claimed should amount to some $540,000, Dep. at 16; that $450,000 in loans from MHT had gone into default in May or June, 1983, *Id.* at 18; that a state income tax lien of $15,000 to $25,000 against VU–TV "went into effect in either December or January, 1983 or 1984" and that VU–TV owed about $35,000 in federal income taxes, *Id.* at 19; that an account receivable of VU–TV from Star Louisiana had been lost, with that company filing for Chapter 11 reorganization in March, 1983 and for Chapter 7 bankruptcy in "about July or August, 1983," *Id.* at 30; that in April or May, 1983, VU–TV was informed that another of its customers, S–TV of Atlanta, Georgia, which owed VU–TV $104,000 or $105,000, was also "filing for bankruptcy," and that within 60 days of its filing for Chapter 11, S–TV filed for Chapter 7 liquidation, *Id.* at 31; that Graphics decided in June, 1983 to no longer make use of VU–TV, *Id.* at 32; that Graphics had given VU–TV a 90-day notice in March, 1983, *Id.* at 33; that VU–TV's current debt to trade creditors amounted to $1.1 million, *Id.* at 35; and that Barton was the largest of these creditors, *Id.* at 36. Taken as a whole, Horak's pronouncements indicate that VU–TV faced great financial difficulties. The problem that Barton and TeleFest face with the indications of these difficulties is that they are indicia of distress after May 6, 1984. All or virtually all of the events spoken of by Horak at deposition struck with full force in June, 1983 or later. These events cannot be considered relevant to VU–TV's solvency on May 6, 1983.

cy for the purpose of determining that there was a fraudulent conveyance.

■ Not only is the question of insolvency one of fact, but whether "fair consideration" inhered in a conveyance is also generally a question of fact, *In re Roco Corp.*, *supra* at 981–982; *Klein v. Tabatchnick*, *supra* at 1047–1048; 4 *Collier on Bankruptcy* (15th Ed.1982) ¶ 548.09 at 548–96 to 97. Since insolvency has not been established, the court need not reach the question of fair consideration, but because the parties have forcefully argued their respective views in regard thereto, it will be discussed.

■ Where a conveyance is supported by an antecedent debt, a grantee of that conveyance may support it when it is attacked as fraudulent by merely pointing to the antecedent debt as the consideration, provided the grantee acted in good faith in accepting it. *Johnson v. Lentini*, 66 N.J. Super. 398, 406, 169 A.2d 208 (Ch.1961); *Hersh v. Levinson Bros., Inc., supra*, 117 N.J.Eq. at 133, 171 A. 736; *Riverside Trust Co. v. Dietrich*, 112 N.J.Eq. 43, 45, 163 A. 275 (1932). It is a different case, however, where there is an antecedent debt owed by someone other than the grantor. *See* Annotation, *Transaction in consideration of discharge of antecedent debt owed by one other than grantor as based on "fair consideration" under Uniform Fraudulent Conveyance Act*, 30 A.L.R.2d 1209. It is there stated, at 1210, that

> No case within the scope of this annotation has been discovered wherein the court has upheld a transaction, the consideration for which was the discharge of an antecedent debt owed by one other than the grantor, as based on 'fair consideration' under the Uniform Fraudulent Conveyance Act.

This principle applies not only with regard to a spouse's "conveyance" in consideration of the release of another spouse's debt, *see*, for example, *Hollander v. Gautier*, 114 N.J. 485, 489, 168 A. 860 (Ch.1933), and the mortgage of partnership property to pay a partner's debts; 30 A.L.R.2d at 1212, but also with regard to a corporation paying the debt of another corporation.

Although the case law in this area is sparse, it is more plentiful than the one case cited in the Annotation, *supra*, i.e. *Bennett v. Rodman & English*, 2 F.Supp. 355 (S.D.N.Y.) *aff'd* without opinion, 62 F.2d 1064 (2d Cir.1932). There have been at least three more recent cases that stand for the proposition that a transaction, the consideration for which was an antecedent debt of a corporation owed by one other than the corporate grantor, was not supported by "fair consideration" under the Uniform Fraudulent Conveyance Act.

In *In Re B–F Building Corporation*, 312 F.2d 691 (6th Cir.1963), an insolvent company named B–F owned certain real property, which it leased to Baird-Foerst, also bankrupt and a distributor of General Electric appliances. An individual named Baird was president of and held a controlling interest in both corporations. B–F owned premises occupied by Baird Foerst, but purchased a new site. Its checks in payment for the land were returned for insufficient funds. Baird-Foerst borrowed money from the Central National Bank and B–F defaulted on the land contract. Both companies became financially strapped and B–F decided to assist Baird Foerst by giving the bank from which the latter had borrowed a demand cognovit note for the sum borrowed. The note was endorsed by Baird and indicated that it was secured by the sale of B–F property. The District Court found, after both companies petitioned for bankruptcy, that the execution of the demand cognovit note was fraudulent because unsupported by consideration. B–F was found to owe a considerable sum to General Electric, which argued that payment of another's debt is a transfer without fair consideration. The Sixth Circuit agreed, citing, among other cases, *Davis v. Hudson Trust Co.*, 28 F.2d 740 (3d Cir. 1928), a case involving a husband-wife fraudulent conveyance.

In Re B–F Building Corporation, Bennett, Davis, and *Edward Hines W. Pine Co. v. First National Bank*, 61 F.2d 503 (7th Cir.1932), represent a line of cases that support the proposition that, while the agreement of a creditor to extend a debtors

time for payment or forbear suing on a claim constitutes a "valuable" consideration for the promise of a third party to pay a debt, such valuable consideration is not synonymous with "fair" consideration under the statute. Rosenberg, *supra* at 256.[7] It might well be argued that the case at bar is similar to *In Re B–F Building Corporation, supra*, in that here VU–TV has attempted to affect a conveyance, consideration for which is not primarily a debt that it already owed MHT but, rather, debts owed by two related companies. The rule in *In Re B–F Building Corporation* and the other cases cited is a useful one in that it prevents insolvent corporations from preferring one creditor over another to an extent greater than their actual debt to the creditor preferred. This results in a more equitable distribution of the insolvent corporation's assets when creditors knock at the door of the troubled entity and militates against the insolvent corporation using its remaining assets for the benefit of related entities.

MHT distinguishes *In Re B–F Building Corporation* on two grounds: (1) that the debtor company was demonstrably insolvent at the time of the conveyance and (2) that the court's conclusion that fair consideration had not passed was premised on its finding that "the only thing the bank gave for [the debtor's] demand note ... was an unsecured and probably worthless note of [debtor's related company]," while here a guarantee was given that cross-collateralized the loan with the corporation's assets. MHT relies upon what it calls the "identity of interest" rule found in *In Re Royal Crown Bottlers of North Alabama*, 23 B.R. 28 (N.D.Ala.1982). There, the court held that an insolvent debtor receives "less than a reasonably equivalent value" when it transfers property for a consideration to a third party, but that

A clear distinction from this rule exists, however, if the debtor and the third party are so related or situated that they share an 'identity of interests', because what benefits one, will in such case, benefit the other to some degree.

*Id.* at 30 (footnote omitted).

MHT asserts that the June 4, 1984 Adamko affidavit shows the "close and intertwined relationship" between the parent company and its subsidiaries and that the loans to CATV were based on that close relationship and benefited VU–TV. Tele-Fest retorts that MHT has the burden of specifically showing how such a benefit accrued to VU–TV from the loans to its parent. It quotes a passage from *Royal Crown Bottlers, supra* which sets out the "identity of interest" rule:

The ultimate question then becomes one of determining the value of this vicarious benefit and testing it by the measure of 'reasonably equivalent' for the property transferred by the insolvent debtor.

When the consideration for a transfer passes to the parent corporation of a debtor/subsidiary making the transfer ... the benefit to the debtor may be presumed to be nominal, in the absence of proof of a specific benefit to it.

I am satisfied that it was intended that a benefit would flow to VU–TV through the loans to CATV and San Antonio ultimately guaranteed by VU–TV. In April, 1982, when MHT was considering whether or not to extend a $300,000 loan to CATV for the purchase of San Antonio, MHT certainly regarded CATV and VU–TV as having an identity of interest. An internal memo from MHT Assistant Vice-President Fasano, dated April 12, 1982, in which that loan is discussed is, in fact, entitled "VU–TV, Inc. CATV Products, Inc." This memo evidences what MHT has consistently argued,

---

7. More recently, there have been cases from the Western District of Oklahoma involving corporations that claim that the release of an antecedent debt of another corporation served as fair consideration for their transfer of some property. In *Palmer v. Stokely*, 255 F.Supp. 674, 680 (W.D.Okl.1966), it is stated that "The payment of the debts of another by a corporation while insolvent is not a fair consideration to the corporation." *See also Steph v. Branch*, 255 F.Supp. 526, 529, 531 (W.D.Okl.1966) transfers of corporate merchandise and material without consideration where proceeds therefrom used to reduce purchase price not given by others in stock purchase; *In re College Chemists, Inc.*, 62 F.2d 1058 (2d Cir.1933).

i.e. that it always regarded VU–TV and its parent in tandem in its dealing with these companies. Such an outlook is relevant in considering whether the transferee of a conveyance acted in good faith. *See generally Good Faith and Fraudulent Conveyances*, 97 Harvard Law Review 495 (December 1983). It should also be noted that here the loan transactions were obviously at arm's length, another indicia of the transferee's good faith. Rosenberg, *supra* at 249.

Even more important than good faith in considering whether fair consideration passed is the nature of the transferor's business and its relationship with its parent. It is clear from the "Credit Department Review" and the Harris memo discussed above that VU–TV was devoted to providing programming for cable television companies, e.g. the ChicagoFest Blues Series. Monies loaned to VU–TV's parent to purchase a cable television system or for other moves directed toward expansion would most probably provide an additional and obviously secure market for VU–TV. The consideration for VU–TV's guarantee of the loans of its parent and sister companies may not have been a direct benefit, but it was a specific enough benefit for a reasonable trier of fact to conclude that fair consideration inhered in the conveyance.

In any event, the notion that a benefit accrues to a subsidiary only when there is a direct flow of capital to that entity the result of its guarantee of a loan to its parent is inhibitory of contemporary financing practices, which recognize that cross-guarantees are often needed because of the unequal abilities of interrelated corporate entities to collateralize loans. As one commentator has noted

> ... (C)ourts often require a benefit to the guarantor corporation so that the transaction ostensibly fulfills a corporate purpose of the guarantor and is therefore not ultra vires. The concept of 'benefit' cannot, however, be defined precisely. For example, securing a future sale might constitute a benefit. Consummating a transaction which will improve a corporation's public image might also be

said to benefit that company. Since the concept of benefit involves the potential for such a wide range of results, courts have often required that the benefit be 'direct'. It is questionable whether this requirement has helped, however, since courts also vary considerably in their interpretation of the term 'direct.'

Note, *Upstream Financing and the Use of the Corporate Guarantee*, 53 Notre Dame Lawyer 840, 842 (1978).

Where there are indicia of a bona fide financing arrangement, not designed as a shield against other creditors, the lack of perceptible "direct" benefit to a subsidiary guaranteeing the loan of its parent should not be viewed as tantamount to a lack of "fair consideration" under the UFCA. Indirect benefit provides the necessary "fair consideration".

> [Some courts have] rationalized upholding various transfers against fraudulent conveyance challenges by finding that sufficient consideration passed to the transferor because an opportunity had been given to it to escape bankruptcy through the strengthening of an affiliated corporation that received the benefit of the transfer. Such an approach seems indisputably proper when a weak but still solvent entity is rendered insolvent only because of the inclusion of the guaranty on the liability side of the balance sheet. This permits the analysis to focus upon economic reality in the appropriate factual context without rewarding legal laxity or inflexibly ignoring real benefits merely because they have no place on the company's balance sheet.
>
> Such an approach would lead to a finding of fair consideration for a guaranty in a variety of other appropriate contexts. If an alter ego situation presents sufficient consideration, then so should the guaranty of a loan to a third party that is not the alter ego of the guarantor but whose continued health and existence is vitally important to the guarantor—a vital supplier or customer, for example. Under this approach, fair consideration to the guarantor could be found without

much difficulty when the loan to the affiliated corporation strengthens its operation sufficiently so that the health of the guarantor is maintained or improved, even though bankruptcy was not imminent.

*Rosenberg, supra* at 245–246 (footnotes omitted).

The author cites, among other cases, *Williams v. Twin City Company,* 251 F.2d 678, 681 (9th Cir.1958), in which it is stated that direct consideration running from the creditor to the debtor need not be present for there to be fair consideration. Instead, consideration can run to a third party, so long as it is given in exchange for the promise sought to be enforced. Contemporary corporate practices of vertically and horizontally dividing the integrated operations of what is essentially one enterprise among a number of legally distinct entities, making it necessary for financial institutions to frequently obtain "upstream" and "cross-stream" collateralizations, demand that a broad view of "fair consideration" be taken.

One commentator on the law affecting "upstream" guarantees, in which a subsidiary guarantees the repayment of a loan to a parent corporation, and "cross-stream" guarantees, in which a subsidiary guarantees the repayment by another subsidiary of a common parent corporation, see Coquillette, *Guaranty of and Security for the Debt of a Parent Corporation by a Subsidiary Corporation,* 30 Case Western L.Rev. 433, 434 & n. 4 (1980), has opined that

> Because Parent and Subsidiary are part of a single economic unit, it is both logical and desirable that Parent be able to borrow based on the value of its subsidiaries' property and assets and that lenders be able to enjoy the full amount of protection which the borrower can make available. Clear legal treatment of these transactions would enable borrowers and lenders to enjoy commercially required confidence in the effectiveness of their arrangements, but the law relating to upstream guaranties and associated grants of security interests is at present difficult to determine and apply.

*Id.* at 436–437 (footnote omitted). Coquillette also has concluded that it is desirable for indirect benefits to a subsidiary to suffice as "fair consideration":

> The existence of fair consideration is therefore more safely determined by what Subsidiary has obtained in the transaction. Some of the funds obtained by Parent may flow through to Subsidiary. In addition, Subsidiary will receive a right to subrogation to the lender's claim against Parent. If Parent has other subsidiaries, Subsidiary may receive cross-guaranties from other subsidiaries and a right of contribution in the event that it must perform on the guaranty. Subsidiary also receives the intangible benefits of maintaining Parent's financial strength...

*Id.* at 452.

The following hypothetical with "facts" very like those in the instant matter has been posited by yet another commentator in support of the proposition that fair consideration may inhere in a conveyance even though that consideration results only in indirect benefit to the guarantor. A parent corporation, P, which owns two subsidiaries, A and B, asks a bank for a $2 million loan to be used to acquire C, a company that will be integrated into P's manufacturing and marketing system. A and B are required to guarantee the loan to P with equipment, inventory and accounts receivable. Eventually, P, A and B file for reorganization under Chapter XI and then for liquidation.

> The 'fair equivalent' received by A and B may also be sought in benefits which they expected to receive from P's acquisition of C, or other benefits resulting from the over-all corporate relationship. For instance, in our hypothetical case it was believed that the acquisition of C was desirable because its product line complemented that of A. Bank could argue that A at least expected to benefit by the affiliation with C. In other fact situations the indirect benefits may be even clearer and more substantial. The transaction of which the guaranty is a part may safeguard an important source

of supply, or an important customer for the guarantor. Or substantial indirect benefits may result from the general relationship between the parent corporation and its subsidiaries, rather than the particular transaction giving rise to the guaranty.

Consider another hypothetical situation in which a holding company owns 50 subsidiaries, each of which operates a single retail store. Another subsidiary handles buying for the entire chain through a central purchasing system. All advertising and financial functions are also handled centrally, and employees all work under union contracts covering the entire chain. The entire operation is an integrated one from an economic point of view even if the separate corporate identities of the various subsidiaries are carefully preserved, and separate accounting records are carefully maintained for each store. Because of economies of scale, the chain will be able to obtain goods, services and credit on more favorable terms than would be offered to any of the individual corporations. In such a situation, if the holding company borrows in order to open new stores owned by new subsidiaries, existing subsidiaries which guarantee the parent's obligations may well have received substantial indirect benefits which will constitute a fair equivalent consideration, even though the proceeds of the particular loan is used to open new stores, and the existing subsidiaries derive no direct benefit from these particular transactions.

Normandin, "Intercorporate Guaranties and Fraudulent Conveyances" in *Personal Property Security Interests Under the Revised UCC* 361, 370–371 (1977).

■ Here, I find that there was "fair consideration" and reject the claim that the guarantee constituted a fraudulent conveyance.[8]

■ Since a fraudulent conveyance will not be declared, the question of MHT's alleged priority of security interest comes to the fore. TeleFest does not take issue with the proposition advanced by MHT and supported by authority that "in the absence of a statutory or common law exception ... a secured creditor who has duly filed a financing statement is entitled to priority over a subsequent lien creditor seeking to levy on or otherwise claim the same collateral." *Mudge v. Sher-Mart Manufacturing Co.*, 132 N.J.Super. 517, 521, 334 A.2d 357 (App.Div.1975). *See also DuBay v. Williams*, 417 F.2d 1277, 1286–1287 (9th Cir.1969); *Grain Merchants of Ind. v. Union Bank & S. Co., Bellevue Ohio*, 408 F.2d 209, 213 (7th Cir.) *cert. denied* 396 U.S. 827, 90 S.Ct. 75, 24 L.Ed.2d 78 (1969); *Rosenberg v. Rudnick*, 262 F.Supp. 635, 638 (D.Mass.1967). 28 U.S.C. § 1962 provides that "Every judgment rendered by a district court within a State shall be a lien on the property located in such State in the same manner, to the same extent and under the same conditions as a judgment of a court of general jurisdiction in such State...." N.J.S.A. 12A:9–301(3) states that "A 'lien creditor' means a creditor who has acquired a lien on the property involved by attachment, levy or the like...." Thus if MHT filed a financing statement before TeleFest became a lien creditor by levying by Writ of Execution, MHT has a priority over TeleFest. That is precisely what occurred here.

Under N.J.S.A. 12A:9–301(4).

A person who becomes a lien creditor while a security interest is perfected takes subject to the security interest only to the extent that it secures advances made before he becomes a lien creditor or within 45 days thereafter or made without knowledge of the lien or pursuant to a commitment entered into without knowledge of the lien.

MHT has provided ample evidence that the May 6, 1983 security interest secured advances made before TeleFest became a lien

---

8. Interestingly, a 1979 Note, *The Corporate Guaranty Revisited: Upstream, Downstream, and Beyond—A Statutory Approach,* 32 Rutgers L.Rev. 312, 338, stated that "... (N)o recent case has been found in which a guaranty was invalidated on the ground of its adverse impact on a creditor."

creditor and has, therefore, established its priority of security interest with respect to so much of the monies being held for the benefit of VU–TV by Graphics as are now required to satisfy the debts owed MHT by VU–TV.

 TeleFest also makes an extended argument for the marshalling of assets through the court's use of its equitable powers. It has repeatedly been said that the equitable doctrine of the marshalling of assets rests upon the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor who may resort to only one of the funds. *See*, e.g., *Meyer v. United States*, 375 U.S. 233, 84 S.Ct. 318, 11 L.Ed.2d 293 (1963); *In Re Beacon Distributors, Inc.*, 441 F.2d 547 (1st Cir.1971); *Columbia Bank for Cooperatives v. Lee*, 368 F.2d 934 (5th Cir.) *cert. denied* 386 U.S. 992, 87 S.Ct. 1308, 18 L.Ed.2d 338 (1966); *Victor Gruen Associates, Inc. v. Glass*, 338 F.2d 826 (9th Cir. 1964); *General Electric Credit Corp. v. Cambria S & L Assoc.*, 448 F.Supp. 782 (E.D.Pa.1978). Where a single fund only is available, the doctrine of marshalling is inapplicable. *Mastan Co. v. S.S. Sapphire Sandy*, 293 F.Supp. 68, 74 (D.N.J.1968), *aff'd* 418 F.2d 177 (3rd Cir.1969), *cert. denied* 397 U.S. 1009, 90 S.Ct. 1238, 25 L.Ed.2d 422 (1970). In fact, the doctrine may not be invoked in any instance in which the marshalling of assets for the benefit of one party would result in prejudice to the interests of another party. *See Matter of St. Cloud Tool & Die Co.*, 533 F.2d 387, 391 (8th Cir.1976), *In Re Beacon Distributors, supra* at 548. Here, no second fund to which MHT may resort is evident and the bank will clearly be prejudiced if TeleFest recovers part of the fund being held by Graphics. Accordingly, I decline to marshall assets.

Finally, Graphics has moved to withdraw $33,637.15 from the escrow fund it is maintaining for the benefit of VU–TV. Sometime before December 5, 1983, Graphics

paid that amount to Paramount Pictures, a payment it says was not made from the funds being held by Graphics for the benefit of VU–TV, but rather from Graphics' own, unrestrained funds.[9] Graphics' counsel, Peter Jaffe, explained that on September 29, 1982, VU–TV and Graphics' wholly-owned subsidiary, Digital Paging Systems of Texas, Inc. ("Digital"), agreed that VU–TV would act as the "booker/buyer" of programming that Digital would exhibit on its television distribution system. The fees paid to VU–TV would be based on the number of subscribers to Digital's system.

VU–TV licensed a number of films for that system from Paramount Pictures, conditioned by Paramount on Graphics and Digital entering into an "Authorization Agreement" which specified that VU–TV was empowered to license films to be shown on the Graphics-Digital system and that "the payment of license fees (would) be made to Paramount by Digital, Graphics or by VU–TV, Inc. on their behalf." According to Jaffe, at some point Graphics determined that VU–TV was experiencing financial difficulties and terminated its agreement with VU–TV on June 30, 1983. The "Authorization Agreement" with Paramount remained in effect because royalties to Paramount continued to accrue past the date of the termination of the agreement with VU–TV. When VU–TV failed to pay royalties to Paramount, Graphics—desirous of continuing to obtain programming from Paramount and deeming itself obliged to pay—made payments directly to Paramount, including the $33,637.15.

Jaffe correctly states that payment of the Paramount monies was the principal debt of Graphics and Digital and that VU–TV was only secondarily liable as an agent. By paying Paramount, Graphics appears to have done nothing more than acquitted itself of its own debt. This dispels any notion that Graphics violated restraints by making the payment to Paramount as it did not make good one of VU–TV's debts but rather paid on its own debt as a principal of

---

9. This payment prompted TeleFest to move to have Graphics held in contempt, its second such motion, both of which were unsuccessful. TeleFest first moved when, because of "administra-

tive error", Graphics paid $50,000 of funds which were subject to restraint to VU–TV. TeleFest may well have another remedy against Graphics for the latter's admitted negligence.

the "Authorization Agreement". Nonetheless, Graphics should only be allowed to recoup that sum that it seeks from the fund being held for VU–TV's benefit if it not only paid the $33,637.15 it owed to Paramount but also paid the same sum into the escrow fund of monies being held for the benefit of VU–TV from its own unrestrained funds.

In a letter of July 6, 1984, Jonathan Davis, attorney for Graphics, states that that company deposited $33,637.15 into the escrow fund

> as a precautionary measure pending validation by this Court of its position with regard to said funds. Graphic has heretofore been forced to make two payments for each debt due and owing to Paramount Pictures Corp. under the Authorization Agreement. One payment has been made to Paramount Pictures Corp. and the second payment to the escrow account.

Absent convincing evidence to the contrary, the court will accept as true the representation of an officer of the court that his client paid monies into the escrow account equal to those that it paid out to Paramount in the mistaken belief that it was obligated to do so because VU–TV and not Graphics was the principal obligor of the agreement with Paramount. Further, the court accepts as true the representation that it was necessary that debts to Paramount be paid in order for Graphics' connection with that company to continue while at the same time necessary that Graphics not appear to violate a court order by paying one of VU–TV's debts with monies being held by Graphics for the benefit of VU–TV.[10]

Graphics will, therefore, be allowed to withdraw the sum in question from the escrow account. *See Camden County Welfare Bd. v. Federal Deposit Ins. Corp.* 1 N.J.Super. 532, 62 A.2d 416 (Ch.Div.1948) (where obligation discharged by one not primarily liable for it, but who believes himself to be acting in performance of legal duty, or for protection of a legal right,

party discharging obligation entitled in equity to demand reimbursement). Obviously, this withdrawal is without prejudice to VU–TV's claim that Graphics owes it considerably more money than Graphics presently admits to owing and MHT's right, as the legal subrogee of the debt owed VU–TV by Graphics, to pursue that claim.

The motion to declare a fraudulent conveyance is denied. MHT is declared to have a priority of security interest in so much of the fund that is being held by Graphics as will satisfy VU–TV's debt to MHT. Representations made to the court by Graphics indicate that the fund does not now exceed the amount VU–TV owes to MHT and the latter will therefore be entitled to the entire fund. In the event that the amount held by Graphics comes to exceed the amount to which MHT is entitled by virtue of its priority of security interest, plaintiff and other parties holding junior liens should move for appropriate pay-overs of the remaining funds. Graphics' motion to withdraw funds from the escrow account is granted.

Counsel for MHT is directed to submit, within ten days, an order reflecting this court's opinion.

---

**10.** It would frankly be difficult to comprehend that Graphics was unaware of its own principal liability to Paramount and, therefore, failed to realize that it could merely pay its debt without any involvement on the part of VU–TV were it not for the court's awareness of Graphics' prior "mistake" with regard to the $50,000 paid out to VU–TV, admittedly in violation of a court order.